## BATE REFRIGERATING COMPANY *v.* SULZBERGER.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE
SECOND CIRCUIT.

No. 687. Argued November 15, 16, 19, 1894.—Decided March 4, 1895.

The provision in Rev. Stat. § 4887 respecting a "patent granted for an in-
vention which has been previously patented in a foreign country" refers
to foreign patents granted previously to the issue of letters patent for
the same invention by the United States, and not to foreign patents
granted previously to the application for the American letters.

When such foreign letters issue before the United States letters issue, the
American patent is so limited as to expire at the same time with the
foreign patent having the shortest term, but in no case is it to be in force
more than seventeen years.

When the language used in a statute is plain and unambiguous, a refusal to
recognize its natural obvious meaning may be justly regarded as indicat-
ing a purpose to change the law by judicial action, based upon some
supposed policy of Congress.

*United States* v. *Bowen,* 100 U. S. 508, cited approvingly to the point that "the
Revised Statutes must be treated as the legislative declaration of the
statute law on the subjects which they embrace on the first day of
December, 1873," and that "when the meaning is plain, the courts cannot
look to the statutes which have been revised to see if Congress erred in
that revision, but may do so when necessary to construe doubtful lan-
guage used in expressing the meaning of Congress."

VOL. CLVII—1                                                    1

THE certificate of questions sent up in this case was as follows:

"A decree dismissing the bill in this cause after a hearing upon the setting down of pleas thereto having been made in the Circuit Court for the Southern District of New York, and an appeal having been taken therefrom to this court, and the cause having come on for final hearing, certain questions of law arose concerning which this court desires the instruction of the Supreme Court of the United States for its proper decision. The facts out of which the questions arose appear from the bill and pleas thereto on file in the cause and are as follows:

"On the first day of December, 1876, John J. Bate applied for letters patent for an improvement in processes for preserving meats, etc., and after sundry proceedings in the United States Patent Office, including an appeal to the examiners-in-chief, as well as a subsequent contested interference with a patent to one Ezekiel S. Halsted, a patent was issued to said Bate on the 20th day of November, A.D. 1877, the grant being in terms for seventeen years. Afterwards, on the 22d day of November, 1877, said John J. Bate assigned said patent to the Bate Refrigerating Company, the assignment being duly recorded on the 23d day of November, 1877.

"After the application had been filed in the United States Patent Office and before the patent was issued two foreign patents were granted for the same invention, to wit, one patent granted by the British government to William Robert Lake on a communication from said Bate dated January 29, 1877, for the term of fourteen years from said date, said patent being sealed July 13, 1877, and the complete specification being filed July 26, 1877, and the said invention was patented or caused to be patented by the said Bate; the other of said patents granted by the government of the Dominion of Canada to the same John J. Bate under date of January 9, 1877, for five years. Both foreign patents expired before the expiration of the seventeen years specified in the grant of the United States patent to Bate. The bill was filed July 25, 1892, and prayed for an injunction against infringement and for an account.

" Upon these facts this court desires instruction upon questions of law for the proper decision of said cause, namely, whether the invention for which the United States patent aforesaid was issued to said John J. Bate had been ' previously patented in a foreign country' within the meaning of those words in section 4887 of the Revised Statutes, and whether the said patent expired under the terms of said section before the expiration of the term .of seventeen years from its date, and to that end hereby certifies said questions to the Supreme Court."

*Mr. Charles E. Mitchell,* (with whom was *Mr. James J. Storrow* on the brief,) for appellant.

*Mr. Benjamin F. Lee* by leave of court filed a brief on behalf of the Chemical Rubber Company in support of the contention of the appellant.

*Mr. Wheeler H. Peckham* and *Mr. Edmund Wetmore* for appellees.    *Mr. Leonard E. Curtis* was on their brief.

*Mr. B. H. Bristow* and *Mr. William H. Kenyon* by leave of court filed a brief on behalf of the Harrison International Telephone Company in support of the contention of the appellees.

*Mr. Charles H. Aldrich* by leave of court filed a brief on behalf of Milo G. Kellogg in support of the contention of the appellees.

*Mr. James C. Carter* closed for appellant.

I.  The defendants, in support of their contention that " previously patented " means patented before the issue of the American patent, put themselves upon what is called the rule of literal, grammatical interpretation, and insist that such meaning is the necessary import of the language ; and that it would therefore be to no purpose to show that such a construction would make the law a piece of senseless and mischiev-

ous folly, unjust to inventors, prejudicial to the public, and utterly inconsistent with a long-settled policy of the government. This position cannot be maintained. Undoubtedly language may be employed which is so precise and clear as to admit of but one meaning. In such a case, as there can be no doubt, none of those inquiries which are designed to remove doubt are legitimate. It matters not in such a case what the consequences may be. The legislature must be taken to have meant what it has indubitably said. But there are very few such cases as these; and the above-mentioned rule, therefore, carries us but a short way, and has but a *prima facie* preference. Statutory Interpretation, (edited by Endlich,) §§ 25–27.

At what point are we to determine whether the language of a clause of a statute admits of but one interpretation? Single sentences often seem quite clear of themselves, but become open to doubt when read in connection with something which precedes or follows. An unlearned person may interpret a clause in a statute, and think that but one interpretation is possible; but a lawyer, skilled in the subject to which it relates, might be immediately perplexed with doubt.

In order to know whether the statute is open to doubt, it must be intelligently applied to the subject-matter to which it relates. That subject is the patent system of the United States and the laws regulating it.

When it is so applied, its language will be the better understood, and it can be the better determined whether it admits of more than one interpretation. *Church of the Holy Trinity* v. *United States*, 143 U. S. 457, 458; *United States* v. *Lacher*, 134 U. S. 624; *Atkins* v. *Disintegrating Co.*, 18 Wall. 272.

Applying the section to that subject-matter, a doubt immediately arises as to the soundness of the first-blush interpretation. Take the first clause of section 4887. "No person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid by reason of its having been first patented or caused to be patented in a foreign country." The defendants insist that the words "first patented" mean patented in a foreign country at some time before the issuing a patent in the United States. But why

should Congress enact that a prior foreign patent should not be a bar to an American patent when it never was, and was never by any one supposed to be, a bar? It was only in case the foreign patent had been taken out prior to the application for the American patent, that it could have, under the law as it had always stood, any effect to debar, or otherwise injure, the American discoverer.

The mind cannot do otherwise than doubt whether Congress did not by the words "first patented" mean patented before application; because the clause then becomes intelligible and reasonable.

Any unjust result or consequence which would flow from a particular interpretation of a statute has always been regarded as a reason which, of itself, should induce a close examination of everything having a bearing upon the meaning of the legislature; that is to say, it justifies and requires the work of interpretation. *Wilson* v. *Rousseau*, 4 How. 646.

Section 4887 is, on all hands, admitted to be a mere revision and reënactment of sec. 25 of the act of 1870, and means precisely what that section means. *Edison Co.* v. *United States Co.*, 35 Fed. Rep. 134; *Siemens* v. *Sellers*, 123 U. S. 276. The proper question, therefore, is, what is the meaning of sec. 25 of the act of 1870? But the act of 1870 is itself a revision of the then existing law, and this 25th section, if the interpretation of the defendants is correct, changes, in a very material respect, the law which it affects only to revise; for there is no doubt that, by the law as it stood at the time of the revision of 1870, and had stood for a generation, the taking out of a foreign patent had no effect upon the right of the domestic inventor, except when it was taken out prior to his application. It is a rule, without exception, that all revisions, when it is suggested that they change the preëxisting law, are open to examination, in order that it may be more clearly seen whether the preëxisting law is really changed; and, upon such examination, there is a *fixed presumption* that the prior law is *not* changed, unless there be evidence that such was the legislative intent.

The reason of this rule is apparent. Revisions are usually

the work of one mind, or a few minds, selected for the purpose of improving the form, without changing the substance of laws; minds, too, which are always endeavoring to express, and thinking they can better express, what another mind has attempted to express. When they are brought before the legislative body for enactment they are accompanied with the declaration, express or implied: "No change has been made by this revising bill in the substance of the existing law as it is settled by statute or judicial decision." The revisers themselves intend no change. The legislative body intends none. But the work of revising laws, of consolidating various statutes, pruning away redundancies, reconciling apparent contradictions, removing ambiguities, etc., is a task for the highest abilities, and is seldom well performed. Changes of language are inevitable, and yet are pregnant with the greatest danger of changing the meaning.

But for the rule above mentioned, every considerable revision would, in the language of Mr. Justice Baldwin, *McClurg* v. *Kingsland*, 1 How. 202, 211, by "changing the law according to every change of mere phraseology, make it a labyrinth of inextricable confusion."

A multitude of authorities have sanctioned this doctrine. *Yates's case*, 4 Johns. 316; *Goodell* v. *Jackson*, 20 Johns. 693; *In re Brown*, 21 Wend. 316, 319; *Douglass* v. *Howland*, 24 Wend. 35; *Theriat* v. *Hart*, 2 Hill, 380; *Crosswell* v. *Crane*, 7 Barb. 191; *Elwood* v. *Kloch*, 13 Barb. 50; *Dominick* v. *Michael*, 4 Sandf. 374; *Taggard* v. *Roosevelt*, 8 How. Pr. 141; *Jenkins* v. *Fahey*, 73 N. Y. 355; *The L. W. Eaton*, 9 Ben. 289; *The Brothers*, 10 Ben. 400.

Section 25 of the statute of 1870 declared that "the patent shall expire" with the foreign patent. Rev. Stat. § 4887 enacted that "the patent shall be so limited as to expire," etc. It was contended that under the Revised Statutes the patent would be void unless it was so limited by its terms. The words added in the Revised Statutes were apt to convey this meaning, and, if they did not effect this, their insertion was totally without effect. Undoubtedly the fact was that the commissioners intended this change, though their report did

not call attention to it, and that Congress voted without noticing the change, or actually intending to make any.     Thereupon the courts held that a change of plan or policy was not to be deduced from a revision, unless the language was not only apt, but so " plain and unequivocal " as to " demonstrate that intention beyond a doubt."     In other words, the use in a revision of language plain enough, if taken by itself, to effect a change in the law, will not be allowed to have the effect, unless the court is satisfied that Congress in fact realized that effect, contemplated it and actively intended it.

This decision was made in *Canaan* v. *Pound Mfg. Co.*, 23 Blatchford, 173.     In *Bate* v. *Hammond*, 129 U. S. 151, 169, the Supreme Court, deciding the same question the same way, referred with approval to this decision.

The Supreme Court, in *United States* v. *Bowen*, 100 U. S. 508, approved this rule, and their application of it is instructive. See also *Blake* v. *National Banks*, 23 Wall. 307 ; *Meyer* v. *Car Co.*, 102 U. S. 1 ; *Butterworth* v. *Hoe*, 112 U. S. 50.

II.  The statute (Rev. Stat. § 4887) is therefore open to interpretation ; and the inquiry is what Congress intended by the words " first patented or caused to be patented in a foreign country," and by the words " previously patented in a foreign country."   Do they mean patented in a foreign country before the issue of the patent here, or before the application for it ?   A review of the course of legislation upon the subject, in the light of justice and reason, and the clear policy of the law, will leave no reasonable doubt that the latter meaning was the one intended.

It will be agreed that the true method of inquiry is to ascertain what the law was upon the point in question prior to the employment of the particular language under interpretation, to the end that we may see whether there were any, and what, mischiefs or difficulties in the preëxisting law which the language was calculated to correct.

A review of legislation down to 1836 makes the following points clear :

(1)  That the statutes of 1790 and 1793, by making it, among other things, essential to a patent that the invention should not

have been "known" by others than the inventor before the application, rendered a foreign patent issued to the same inventor, prior to his application, a bar to a patent here. This was a result not agreeable to justice or sound policy; but at that time the evil was not of sufficient consequence to attract notice and call for a remedy.

(2). Prior to 1836 it had become otherwise. There was a growing advantage to inventors to be derived from foreign patents, and there was no reason why the taking of one should be made to involve a forfeiture of the inventor's privilege here, or any other punishment. The practice of taking them, so guarded as not to be the source of incidental mischief, was, on the contrary, one which our law should encourage.

(3) It was the intention of Congress in 1836 to do away with this objectionable feature in our patent law, as it then stood, and to encourage the taking out of patents in foreign countries. To this end, while by § 6 of the act of that year careful provision was made to insure that the applicant for a patent should be the first inventor, clauses were inserted in § 7 apparently designed to prevent mere knowledge of the invention prior to the application, as distinguished from use, from being a bar. Patenting, or description in a printed publication, if after the discovery by the applicant, was no longer to be a bar, unless the invention had been "in public use or on sale, with the inventor's consent or allowance, prior to the application." Mere disclosure before application was apparently to be no longer fatal. It would seem, however, that some one who had a hand in shaping the statute was, apparently, not sure that this result was secured by § 7; and, perhaps, it was not secured; for the choice of a foreign patent in preference to an American one may furnish, in some cases, material support to the vague and uncertain doctrine of abandonment. To remove all doubt upon this point, and it being at the same time thought important that one who had taken out a patent abroad should not long delay in making his application in this country, a clause was framed and introduced into § 8, designed to have the double effect of making it clear, that a foreign patent should not bar a patent here, and that the

application here, thus encouraged, should not be long delayed. This clause is the one beginning with the words, " but nothing in this act contained shall be construed to deprive."

(4) This language must be construed as if the supposition or assumption upon which it proceeds were really the fact, and then the effect of the provision becomes, what no one will doubt it really is, a liberty to a certain class of inventors to take out patents abroad without affecting their privilege of taking out patents in this country. That class is those who use diligence and apply for a patent here within six months after obtaining the foreign patent.

This provision gave facility for patenting abroad; but Congress extended it in the act of March 3, 1839. This act did not operate upon those to whom the privilege was given by the act of 1836, but upon persons outside of that class. It did not repeal, alter or modify the act of 1836, but it created a new class of persons who, after patenting abroad, might still receive patents here. This was the wilfully tardy class, those who might neglect to apply here within six months after obtaining patents abroad. And to these it did not give such a patent as it awarded to the first and diligent class; but abridged it by limiting its duration to the term of fourteen years from the date of the foreign patent.

(5) The condition of the law upon the point of the effect of a foreign patent after the act of 1839 was entirely clear. Those who applied for the American patent, within six months after obtaining a foreign patent, were entitled to receive one for the same period as patents ran in other cases. Those guilty of laches and not making application within this period, might still apply, provided their inventions had not got into " public and common use;" but, even when thus entitled to apply, the patent granted was to be limited to a period of fourteen years from the date of the foreign letters. The plan was to encourage patenting both here and abroad, and not to grudgingly permit it.

III. After this plan had stood without objection for more than thirty years, the commissioners appointed to revise the laws of the United States completed a revision of the laws

relating to patents. This was reported to Congress in 1870, with the explanation that it was a revision working no change in substance. It was enacted without any change affecting the present argument and became what is herein referred to as the act of 1870. It was reënacted in the general revision of 1873, without any change, save a slight and wholly unimportant one in mere phraseology. The provision contained in it relative to foreign patents is easily susceptible of an interpretation which makes it, what it was declared to be, a reënactment of the prior law without material change of plan or substance. It is our contention that it is such a reënactment. It is, nevertheless, insisted by the appellees that another interpretation must be put upon it, which reverses the just and reasonable policy of the prior law, and substitutes in place of it a plan repugnant to reason, unjust to inventors, and injurious to the public.

Such a proposition is erroneous upon its face, and is, besides, refuted by a great number of separate, but concurring, reasons :

(1) Because it wholly ignores a settled rule of law relating to the interpretation of revising statutes. This consideration has been already alluded to; but only for the purpose of showing that the statute is open to interpretation. It is equally pertinent upon the question of interpretation after that is declared to be open for debate.

(2) But in the present case we have not only the presumption above mentioned, that no change in the law was intended in the particular under notice, but the history of the statute of 1870, and the incidents attending its passage, demonstrate with a certainty which leaves no room for doubt that the words " first patented " mean, and only mean, patented " before application."

(3) Such a method of ascertaining the intent designed to be expressed by the language of § 25 of the act of 1870 is in accordance with the rules of legal interpretation. It is true we cannot ascertain the views of the body upon a question before it from the views which happen to have been expressed by individual members. Other members may have entertained quite different opinions. But we can, and must, avail

ourselves of authentic evidence to ascertain what the question before the body really was. The court must place itself, so far as possible in construing a statute, in the same position which the legislature occupied in enacting it. The bill itself does not always enable us to do this. In the case of revising statutes, particularly where the revision covers a large body of the law, legislatures habitually rely upon the assurances by committees of their own body, or commissioners appointed by them, as to the particulars, if any, in respect to which the law is changed, and give their attention to those alone. Such laws cannot be properly interpreted except upon the assumption that legislatures regard the statements of committees or commissioners whom they have appointed for the purpose of lightening their own labors. It is on this ground that the petition or other application upon which legislation is sometimes had may be properly resorted to for the purposes of interpretation. It is to enable the court to place itself in the situation of the legislature.

(4) It is for the advocates of that interpretation which introduces a change into the law, apparently so unreasonable, unintended, and unjust, to show that it really was intended, and to point out some probable motive which influenced Congress to make the change — some evil growing out of the pre-existing law, or which the preëxisting law was not calculated to reach. The notion mainly relied upon by them that the interpretation is so clear that it must be accepted without reference to reason, and even against reason, has already been shown to be erroneous.

IV. The interpretation asserted by the appellant is supported by every just consideration, and is in harmony with every rule of construction. It should be unhesitatingly accepted.

(1) It is an easily admissible interpretation. There is nothing in the language employed which excludes it. It is entirely consistent with the rule that to justify a particular interpretation of a statute it must be expressed. The event in reference to which an invention is said in § 25 of the act of 1870, and in § 4887 of the Revised Statutes, to be "first pat-

ented," and the event in reference to which an invention is said in the latter to be " previously patented," are not in terms expressed in those enactments. They are left to be supplied. There is no difficulty arising out of grammar. or otherwise, in making that event to be the application.

It is argued that this would be to read into the statute words not found there. Let it be so. Nothing is more common. There are thousands of instances where it is necessary. It is allowed and enjoined by a familiar rule of interpretation. ·The objection, if it were one, would equally apply to the interpretation of the appellees. They read into the statute an event, namely, that of the issue of the American patent. Words must be read in upon either view. The question is, what words a proper construction requires to be supposed, or supplied.

(2) It is in conformity with reason and justice. That an applicant for an American patent who has satisfied every requirement of diligence and promptitude in making his application, and thus entitled himself to a patent for his invention for the full term of seventeen years, should be subjected, in consequence of something thereafter happening over which he has no control, to the penalty of having his patent abridged for a period, it may be, of many years, and even, as is possible, of losing it altogether, is repugnant to every sentiment of justice.

(3) It is in conformity with the general rationale of the law. Whether a man has a right to a particular grant or legal remedy should depend, as it generally, if not always, is made to depend, upon the state of things existing at the time he applies for it. *Planing Machine Co.* v. *Keith*, 101 U. S. 479; *Root* v. *Ball*, 4 MacLean, 179.

(4) It is in conformity with the prior law established for more than thirty years prior to the time of the asserted change.

(5) It is in conformity with a wise and settled policy of the government, which seeks to encourage the taking out of foreign patents, both for the benefit of the inventor and of the public, in the only way in which that step can be promoted,

namely, by removing every disadvantage or obstruction which may deter the inventor from taking that course.

(6) It is the only interpretation consistent with the policy, real or supposed, to put foreign industries under royalties, because the opposite construction directly and strongly discourages Americans, who are the chief inventors, from ever patenting abroad.

(7) It provides a just discrimination against those who would seek to make an improper use of the privilege extended by wilful delay in accepting it; and in this respect it exactly copies and continues the sole purpose and policy of all previous legislation on the subject of curtailment.

(8) It is in conformity with the fundamental rule which governs the interpretation of revising statutes, and which enjoins that the prior law be deemed to have been continued by the revision, notwithstanding changes of language, unless it appear affirmatively that there was an intent to change it.

(9) It is in harmony with that prime rule of interpretation which enjoins us to assign a meaning, if it be possible, to all the language which a legislature employs. We may not in all instances be able to give effect to every clause; but we should be able to account for its introduction. Says Mr. Justice Harlan in *Montclair* v. *Ramsdell*, 107 U. S. 147, 152: "It is the duty of the court to give effect, if possible, to every clause and word of a statute." See also Endlich on Statutory Interpretation, § 23. The interpretation of the appellees is inconsistent with this rule.

V. The patent system creates or gives rise to contract relations between the government and the patentee, which are of its very gist and substance.

(1) The patent act offers a reward to those who will supply the public with new inventions. A patent is not intended as simply a recognition of merit or of virtue. It is the price which the public pays for the greater benefit it derives from the invention, in the belief that the price offered will induce the creation of what it is offered for.

The statute contains the offer which, when accepted by an inventor, constitutes the promisor's part of that well-known

kind of contract which arises from the offer of a reward, and the act defines the two terms which are essential, to wit: what the inventor is to do in order to become entitled to the reward, and what the exact measure of the reward is.

The Revised Statutes, §§ 4886, 4888, enact that whoever makes a new invention, and brings an intelligible description of it to the public at its patent office, claiming the reward, shall obtain a patent. Section 4884 defines what this reward is. It is "a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the exclusive right to make, use, and vend the invention or discovery."

The bare assertion of the inventor that he has earned the reward, of course cannot be unreservedly accepted. So section 4893 provides that "on the filing" of the description and claim, the promising party, that is, the public, will make an examination through its special agent; "and if, on such examination, it shall appear that the claimant is justly entitled to a patent under the law, and that the same is sufficiently useful and important, the commissioner shall issue a patent therefor."

In contracts of this character (those initiated by the offer of a reward) the acceptance of the offer is made by the performance by the offeree of the consideration. It is this performance which converts the offer into a binding contract. Langdell's Law of Contracts, § 4. And, under the patent law, this performance is fully effected by the filing of the application, accompanied with the required fee. This is a delivery to the party offering the reward of the thing desired. Nothing remains but the duty of payment.

The right of the one party and the obligation of the other are fixed and completed. The privilege reserved to the promisor of an examination for the purpose of identification neither weakens the right nor the obligation. Indeed, as it postpones the day of payment, it imposes an additional obligation to make it as soon as practicable, and to make it in such a way that the making of it shall not diminish the value of the reward to the receiver, nor lighten its burden to the payer. See *Grant* v. *Raymond*, 6 Pet. 218.

(2) Not only does our patent law, by the very nature of its fundamental provisions, initiate a contract, but it contains special provisions which affirm the existence of contract relations. It affords the remedy of specific performance.

This was done to a certain extent by the act of 1836, and the privilege was by the act of March 3, 1859, § 10, conferred in terms substantially the same with those now embodied in § 4915 of the Revised Statutes. These steps, taken long before the act establishing the Court of Claims, were the first recognition of the justice of compelling the government to perform its own obligations where they possessed all the substantial elements of a contract.

(3) In all cases of rights resting in contract, there must be a time when such rights must be viewed as ripening into completion. This time, in the case of the obligation to issue a patent, is left in no manner of doubt. The plain sense of justice tells us that a man to whom an offer of a reward is made for giving, or doing, a particular thing, is entitled to the reward the moment he has done it; and this, in the case of an inventor, is when he describes and discloses his secret to the government. Nothing remains but to pay him. Some time, indeed, may be requisite and some labor, perhaps much time and much labor, to identify the thing and make sure that it conforms to the terms of the offer; but, as already observed, this neither weakens nor postpones the obligation, but rather adds to it another, that it be done as speedily as possible.

VI. The whole argument in support of the interpretation of the defendants finally reduces itself to this, that at the first reading "first patented" and "previously patented" more naturally and logically relate to the time of the issue of the foreign patent. Let it be so. It is safe to say that this argument has never been allowed to prevail, particularly in the case of revising statutes, where either reason, or justice, or the policy of the law, or the history of prior legislation on the same subject, has justified a well-grounded doubt whether such *prima facie* interpretation was correct. To press such an interpretation when *all* these considerations concur in rejecting it is to set reason at defiance.

(1) Such a rule of construction would wipe out of existence nearly the whole of the law of interpretation. We should indeed have much less law to study, but both the laws which men pass and the agreements they make would become, in large measure, unintelligible absurdities. The principal mass of our rules of interpretation is framed upon a recognition of the fact that *prima facie*, first-blush interpretation would throw both the public and the private affairs of men into inextricable confusion.

. (2) Such a rule has never been acted upon. Text writers and judges alike always enjoin in any doubtful case a resort to reason, to justice, to policy, to the antecedent, and surrounding circumstances. Human language, though the best, is by no means a perfect exponent of thought, even when used by the clearest and most skilful minds; as employed by ordinary men, it is full of imperfections. Mankind can never be taught to use language with perfect accuracy by simply subjecting them to inconveniences. That failures in clearness of expression will forever take place must be accepted as a fact, and it is one of the highest functions of the judicial office to ascertain the true meaning of the language actually employed by bringing to bear on it those *other* lights and guides which are to be found outside of the language. *United States* v. *Kirby*, 7 Wall. 482; *United States* v. *Babbit*, 1 Black, 55; *Wilson* v. *Rousseau*, 4 How. 646; *Bloomer* v. *McQuewan*, 14 How. 539; *Paper Bag Cases*, 105 U. S. 766; *Siemens* v. *Sellers*, 123 U. S. 276; *Nash* v. *Towne*, 5 Wall. 689; *Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584; *Canal Co.* v. *Hill*, 15 Wall. 94.

(3) An acceptance by this court of the defendants' rule of interpretation would be a *reversal* of the method it has uniformly adopted in the construction and administration of the patent law from the time when it was first called upon to construe it to the present hour. The court has from the first proceeded upon the view that the main object of Congress was to promote the progress of the useful arts by promising a sure and certain reward to inventors, and in keeping that promise. The language which Congress has employed to carry out this

design has often been obscure, contradictory or otherwise ill-adapted. The court, without violating settled principles of interpretation, has construed the language employed very freely to the end that the object should be secured. Its successive interpretations have been followed and adopted by Congress by the introduction of amendments, and the system is thus in a large degree the creation of the court.

(4) But the most pointed support, both of the *rule* of interpretation insisted upon in this brief, and of its application to the precise case under discussion, is to be found in some recent English adjudications. *In re Johnson's Patent*, 13 Ch. D. 398; *Holste* v. *Robertson*, 4 Ch. D. 9.

VII. The appellees seek to show there is a large assent to their view among the officers of the Patent Office and Judges of the Circuit Courts. If this really existed it would go not very far to support their contention; but it does not. Instead of general concurrence, doubt and dissent are everywhere exhibited.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case is before us upon a certificate made under the sixth section of the act of March 3, 1891, 26 Stat. 826, c. 517, providing that a Circuit Court of Appeals may in any case of which it has appellate jurisdiction certify questions or propositions of law for the proper decision of which it desires the instruction of this court.

On the first day of December, 1876, John J. Bate made application to the United States for letters patent for an improvement in processes for preserving meats during storage and transportation.

Pending this application two foreign patents were granted for the Bate invention; one, for the term of fourteen years, by the British government to William Robert Blake, on a communication from Bate under date of January 29, 1877, which patent was sealed July 13, 1877, and the complete specifications of which were filed July 26, 1877; the other, for

the term of five years, by the government of the Dominion of Canada to Bate himself under date of January 9, 1877.

After these foreign patents were issued, namely, on the 20th day of November, 1877, Bate received a patent from the United States, expressed to be for the term of seventeen years, and assigned it to the Bate Refrigerating Company, the plaintiff in this suit.

The present suit was brought by that company, July 25, 1892, for an injunction against the infringement of the American patent, as well as for an accounting. It was heard in the Circuit Court on pleas to the bill, and a decree was passed dismissing the suit. From that decree an appeal was taken to the Circuit Court of Appeals.

Both foreign patents for the Bate invention having expired before the expiration of the seventeen years specified in the United States patent, the following questions arose in and have been certified by the Circuit Court of Appeals: Whether the invention for which the patent from the United States was issued had been "previously patented in a foreign country," within the meaning of those words in section 4887 of the Revised Statutes; and whether the American patent expired under the terms of that section before the expiration of seventeen years from its date.

The Revised Statutes of the United States provide that any person inventing or discovering any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof, "not known or used by others in this country, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, and not in public use or on sale for more than two years prior to his application, unless the same is proved to have been abandoned," may obtain a patent therefor, which shall contain a grant of the exclusive right for the term of seventeen years to make, use, and vend such invention or discovery throughout the United States and the Territories thereof, and bear date as of a day not later than six months from the time at which it was passed and allowed and notice thereof sent to the applicant or his agent. §§ 4884, 4885, 4886.

By section 4887 it is provided that "no person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been *first patented* or caused to be *patented* in a foreign country, unless the same has been introduced into public use in the United States more than two years prior to the application. But every patent granted for an invention which has been *previously patented* in a foreign country shall be so limited as to expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

Other sections prescribe what the application for a patent shall contain, the nature of the oath or affirmation to be made by the applicant, and the time within which an application shall be completed and prepared for examination. §§ 4888, 4892, 4894.

The plaintiff insists than an invention patented or caused to be patented in a foreign country, before being patented in this country, should not be deemed to have been "previously patented in a foreign country," within the meaning of section 4887, unless the foreign patent was granted *prior* to the *application* for the American patent.

The defendants contend that the respective dates of the American and foreign *patents*, and not the date of the American application, determine the question whether an invention, patented here, has been "previously patented in a foreign country."

Counsel for the respective parties have deemed it necessary to refer very fully to the principal statutes relating to patents for inventions. In our consideration of the case the same method will be pursued — reserving any observations we may make upon the words of particular acts until we shall have given an outline of the history of such legislation by Congress as is supposed to bear upon the questions certified.

The first act of Congress passed under the authority given by the Constitution to promote the progress of science and useful arts, by securing for limited times to authors and in-

ventors the exclusive right to their respective writings and discoveries, was approved April 10, 1790, c. 7, 1 Stat. 109. The persons to whom, under that act, patents could be issued, were those inventing or discovering any useful art, manufacture, engine, machine or device, or any improvement therein "not before known or used." The applicant was required, at the time the patent was granted, to deliver to the Secretary of State such specification in writing containing a description of the invention or discovery — accompanied, when necessary, with drafts or models, and explanations of the thing invented or discovered — as would distinguish the invention or discovery from other things "before known and used," and enable one skilled in the art or manufacture to make, construct, or use the same, "to the end that the public may have the full benefit thereof after the expiration of the patent term." §§ 1, 2.

The act of February 21, 1793, c. 11, which took the place of the act of 1790, made no material change except to restrict the right to a patent to citizens of the United States, and to provide that the invention or discovery sought to be patented should be one "not known or used before the application." 1 Stat. 318. In *Pennock* v. *Dialogue*, 2 Pet. 1, 19, 21, Mr. Justice Story, speaking for the court, said that the addition made by the act of 1793 of the words "before the application," after the words "not known or used" in the act of 1790, was made *ex industria* with the intention "to clear away a doubt, and fix the original and deliberate meaning of the legislature," which was that the invention should be one not known or used by the public before the application.

Then came the act of April 17, 1800, c. 25, which extended the provisions of the act of 1793 to all aliens residing for two years in the United States, and who should make oath or affirmation that the invention, art, or discovery for which a patent was asked, had not " been known or used either in this or any foreign country." That act further provided that any patent for an invention, art, or discovery, subsequently found to have been " known or used previous to such application for a patent," should be void. 2 Stat. 37.

The provisions of the act of 1800 were extended by the act of July 13, 1832, c. 203, to every alien who, at the time of petitioning for a patent, was a resident of this country and had declared his intention, according to law, of becoming a citizen of the United States. But every patent granted under the latter act was to become void if the patentee failed for one year after its date to introduce into public use in the United States the invention or improvement for which his patent was issued, or in case the invention or improvement should, for any period of six months after such introduction, not continue to be publicly used and applied in the United States, or in case of his failure to become a citizen of the United States at the earliest period within which he could become such citizen. 4 Stat. 577.

On the 4th day of July, 1836, Congress passed an act entitled "An act to promote the progress of useful arts, and to repeal all acts and parts of acts heretofore made for that purpose." 5 Stat. 117, c. 357.

By the fifth section of that act it was provided that every patent should be for a term of fourteen years.

The sixth section described those entitled to receive patents, namely, "any person or persons having discovered or invented any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement in any art, machine, manufacture, or composition of matter, not known or used by others before his or their discovery or invention thereof, and not, at the time of his application for a patent, in public use or on sale, with his consent or allowance, as the inventor or discoverer."

The seventh section prescribed an examination of the alleged new invention or discovery, and provided: "If, on any such examination, it shall not appear to the Commissioner that the same had been invented or discovered by any other person in this country prior to the alleged invention or discovery thereof by the applicant, or that it had been patented or described in any printed publication in this or any foreign country, or had been in public use or on sale, with the applicant's consent or allowance prior to the application, if

the Commissioner shall deem it to be sufficiently useful and important, it shall be his duty to issue a patent therefor. But whenever, on such examination, it shall appear to the Commissioner that the applicant was not the original and first inventor or discoverer thereof, or that any part of that which is claimed as new had before been invented or discovered, or patented, or described in any printed publication in use in this or any foreign country, as aforesaid, or that the description is defective and insufficient, he shall notify the applicant thereof, giving him, briefly, such information and references as may be useful in judging of the propriety of renewing his application, or of altering his specification to embrace only that part of the invention or discovery which is new."

The eighth section, after providing for the hearing and decision of opposing claims of priority of right or invention, declared :

"But nothing in this act contained shall be construed to deprive an original and true inventor of the right to a patent for his invention by reason of his having previously taken out letters patent therefor in a foreign country, and the same having been published, at any time within six months next preceding the filing of his specification and drawings. And whenever the applicant shall request it, the patent shall take date from the time of the filing of the specification and drawings, not, however, exceeding six months prior to the actual issuing of the patent; and on like request, and the payment of the duty herein required, by any applicant, his specification and drawings shall be filed in the secret archives of the office until he shall furnish the model and the patent be issued, not exceeding the term of one year, the applicant being entitled to notice of interfering applications." 5 Stat. 120.

We come next to the act of March 3, 1839, c. 88, entitled "An act in addition to 'An act to promote the progress of the useful arts.'" 5 Stat. 353. By § 6 of that act, p. 354, it was declared —

"That no person shall be debarred from receiving a patent for any invention or discovery, as provided in the act approved on the fourth day of July, one thousand eight hundred and

thirty-six, to which this is additional, by reason of the same having been patented in a foreign country more than six months prior to his application: *Provided*, That the same shall not have been introduced into public and common use in the United States, prior to the application for such patent: *And provided, also*, That in all cases every such patent shall be limited to the term of fourteen years from the date or publication of such foreign letters patent."

By the act of March 2, 1861, c. 88, it was provided that all patents thereafter granted should remain in force "for the term of seventeen years from the date of issue," and all extensions of such patents were prohibited.    12 Stat. 246, c. 88, § 16.

By an act approved June 27, 1866, c. 140, 14 Stat. 74, provision was made for the appointment of three persons learned in the law as commissioners, "to revise, simplify, arrange, and consolidate all statutes of the United States, general and permanent in their nature," which should be in force at the time of their final report.    They were directed to "bring together all statutes and parts of statutes which, from similarity of subject, ought to be brought together, omitting redundant or obsolete enactments, and making such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text; and they shall arrange the same under titles, chapters, and sections, or other suitable divisions and subdivisions, with head-notes briefly expressive of the matter contained in such divisions; also with side-notes, so drawn as to point to the contents of the text, and with references to the original text from which each section is compiled, and to the decisions of the Federal courts, explaining or expounding the same, and also to such decisions of the state courts as they may deem expedient; and they shall provide by a temporary index, or other expedient means, for an easy reference to every portion of their report."    Upon the completion of their work they were to "cause a copy of the same, in print, to be submitted to Congress, that the statutes so revised and consolidated may be reënacted, if Congress shall so determine; and at the same time they shall also suggest to Congress such contradictions, omissions, and imperfec-

tions as may appear in the original text, with the mode in which they have reconciled, supplied, and amended the same; and they may also designate such statutes or parts of statutes as, in their judgment, ought to be repealed, with their reasons for such repeal." They were authorized to cause their work to be printed in parts as fast as it was ready for the press, and distribute the same to members of Congress and to such other persons in limited numbers as they saw fit, for the purpose of obtaining their suggestions. 14 Stat. 74, c. 140, §§ 1 to 4 inclusive.

One of the results of that statute was the passage by Congress of the act of July 8, 1870, c. 230, entitled "An act to revise, consolidate, and amend the statutes relating to patents and copyrights." 16 Stat. 198. The original bill, upon which that act was based, was the work of the revisers appointed under the above act of 1866.

The act of 1870 declared, among other things, that every patent should be expressed for the term of seventeen years, and should date as of a day not later than six months from the time at which it was passed and allowed. §§ 22, 23.

But the parts of that act which have most to do with the case before us are its 24th and 25th sections. The 24th section describes in the language of section 4886 of the Revised Statutes, as above quoted, those who are entitled to patents. The 25th section is in these words:

"§ 25. That no person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented in a foreign country : *provided*, the same shall not have been introduced into public use in the United States for more than two years prior to the application, and that the patent shall expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term ; but in no case shall it be in force more than seventeen years." 16 Stat. 198, 201, c. 230.

From this history of acts of Congress relating to patents for inventions, it appears —

1. That in all of them Congress had in mind the date of an

application for a patent, the date of the filing of specifications, and the date of the patent.

2. That, under the act of 1836, a patent could not be granted if it appeared that the applicant was not the original and first inventor or discoverer, or that any part of that which was claimed as new had before been invented or discovered, or patented or described in any foreign publication in use in this or any foreign country; yet, an original and true inventor was not to be deprived of a patent for his invention "by reason of his having previously taken out letters patent therefor in a foreign country, and the same having been published at any time within six months next preceding the filing of his specification and drawings."

3. That, under the act of 1839, an inventor, whose invention had not been introduced into public and common use in the United States prior to the application for a patent, should not be debarred from receiving a patent, by reason of his invention "having been patented in a foreign country *more than six months prior to his application.*"

4. That, under the act of 1870, one whose invention had not been introduced into public use in the United States for more than two years prior to the application for an American patent, should not be debarred from receiving a patent by reason of his invention "having been first patented or caused to be patented in a foreign country" — those words not being qualified, as in the act of 1839, by any reference to the date of the application.

5. That when an American patent was granted, in conformity with the sixth section of the act of 1839, for an invention "patented in a foreign country more than six months prior to the American application," it expired, in every case, at the end of fourteen years "from the date or publication of such foreign letters patent;" and when, in conformity with the twenty-fifth section of the act of 1870, a patent was granted for an invention "first patented or caused to be patented in a foreign country," it expired "at the same time with the foreign patent," or, if there were more than one, "at the same time with the one having the shortest term."

6. That, under the Revised Statutes, while a patent could not be withheld nor deemed invalid by reason of the invention "having been first patented or caused to be patented in a foreign country, unless the same has been introduced into public use in the United States more than two years prior to the application," yet "every patent granted for an invention previously patented in a foreign country shall be so limited as to expire at the same time" with the one having the shortest term — in no case to remain in force longer than seventeen years.

Notwithstanding the difference in the wording of these statutes, the plaintiff contends that the words, in the act of 1870, "first patented or caused to be patented in a foreign country," and the same words, together with the words "previously patented in a foreign country" in the Revised Statutes, refer to a foreign patent issued prior to the application for the American patent, and do not embrace a foreign patent issued after such application although issued before the American patent was issued. In other words, the contention is that when the same invention is patented both in this country and abroad, the American patent remains in force for seventeen years from its date if the foreign patent was issued after the application for, although prior to the date of, the American patent.

What was the interpretation placed upon the act of 1870 by the executive branch of the government?

The objects and scope of that act were considered by Mr. Fisher, the Commissioner of Patents, in several cases within a few months after the passage of the act of 1870. The decisions of the Commissioner derive some importance from the fact that they were rendered while the changes made by the act of 1870 were fresh in the minds of those who, like himself, took special interest in legislation affecting patent rights.

In *Mushet's case*, decided September 19, 1870, the question was as to the extension of letters patent for an improvement in the manufacture of iron and steel, granted May 26, 1857, and antedated September 2, 1856. The Commissioner, referring to the twenty-fifth section of the act of 1870, said:

" When, therefore, the statute declares that the patent shall expire at the same time with the foreign patent, I am very clearly of the opinion, that if, at the expiration of the original term, it appears that the foreign patent has already expired, no prolongation of the term of the American patent can be permitted. This is in accordance with the letter and spirit of the enactment. The intention of Congress obviously was to obtain for this country the free use of the inventions of foreigners as soon as they became free abroad. This is indicated by the use of the phrase 'first patented or caused to be patented in a foreign country,' for it was presumable that American citizens would obtain their first patent here, while a foreigner would first patent his invention in his own country. The statute was designed to prevent a foreigner from spending his time and capital in the development of an invention in his own country, and then coming to this to enjoy a further monopoly when the invention had become free at home. The result of such a course would be, that, while the foreign country was developing the invention and enjoying its benefits, its use could be interdicted here, while if the term of the monopoly could be further extended here, the market could be controlled long after the foreign nation was prepared to flood this country with the unpatented products of the patented process. It appears in this case that under the Bessemer patents, assisted by the Mushet process, English manufacturers have been enabled to send to this country 100,000 tons of steel railroad iron, against 10,000 tons manufactured here. If, now, when both patents are free to all English manufacturers, the American manufacturer must pay a royalty for those inventions, he is immediately placed at a disadvantage as compared with his foreign competitor, and this by the act of the patentee, either in neglecting to obtain that extension abroad, for which he sues in this country, or by devoting his time during the original term to the development of the invention abroad to the neglect of the American field." Com. Dec. (1870) 106, 108.

A like ruling was made October 6, 1870, in the *case of Ward,* an American inventor. Com. Dec. (1870) 126.

In *Boyer's case*, decided October 25, 1870, which was an application for the extension of letters patent granted November 4, 1856, to one Evans, for an improvement in spading machines, it appears that Evans obtained letters patent in England, dated December 17, 1855, sealed May 27, 1856, and which expired December 17, 1869. The Commissioner, referring to section 25 of the act of 1870, said: "In the case of Mushet it was a foreign inventor, and in the case of Ward an American inventor, who were seeking the extension; but in both cases letters patent were first obtained in the foreign country. . . . I was, and am, of the opinion that the policy which Congress plainly declares in this section is that if a foreigner obtains a patent in his own country, and permits it to expire there, it shall also expire in this country, so that the right to use the invention without liability to the inventor shall be simultaneous in this and in the most favored foreign nation. Therefore, while I held that the section did not shorten the term of patents already granted, I also held that it did prevent the extension of such patents when the original term expired. It would, I conceive, be a manifest impropriety to grant to a patentee seven additional years of protection, when the fact has been brought home to me that he first patented his invention abroad, and that his foreign patent has expired. Whether the section in question does or does not actually forbid the extension, it so clearly declares that the American patent shall not survive the death of the prior foreign patent that a decent respect for the declared policy of the legislature would determine an officer, while exercising his discretion, to exercise it in accordance with that policy, and not in opposition to it. It is urged, however, that Congress intended only to reach the case of the foreign inventor who first patented his invention in his own country, and that they did not intend to put the American inventor, who obtained a patent abroad, in a worse position than if he had obtained no patent at all in a foreign country. It is said, with much force, that if the American patentee had not obtained an English or French patent the invention would be free in those countries, even during the lifetime of his original patent, and that the fact

that it was free there would be no bar to the grant of an extension. This may be true, but we have no means of judging of the intention of Congress in this case except by the language employed in the declaration of their will. The language of the statute is, 'first patented, or caused to be patented, in a foreign country.' This, by its terms, includes American citizens as well as foreigners who *first* take out a patent abroad. The term 'patented' may well be construed as applying to foreigners obtaining patents in their own country, and the phrase, 'caused to be patented,' to such persons, not citizens of the same country, including Americans, as should cause their inventions to be introduced or patented there. It does not include either foreigners or citizens who first obtain their patents in this country. It was supposed that American inventors would first obtain their patents here, in which case they would not have been within the terms of the section; but if, on the other hand, they choose to obtain patents abroad before doing so in their own country, they were to be placed upon the same platform as the foreign patentee. It is reasonable to suppose that the inventor will follow up his earliest patent with the greatest vigor, and that, other things being equal, he will protect his invention first in that country where he expects to make most use of it. If, therefore, the American inventor chooses to exhibit this preference for a foreign country and to give them the first information respecting his invention, and the earliest opportunity of using it, the law makes no distinction between him and the foreign inventor who obtains his first patent at home." Com. Dec. 1870, pp. 130, 131.

In the *case of Smith and Skinner*, decided October 26, 1870, the Commissioner said: "In the cases of Ward and Boyer I held that the grant of a foreign patent before the issue of an American patent was fatal to the application for the extension of the American patent if the foreign patent expired before the original term of the patent sought to be extended. It is immaterial whether the American patent was applied for before the foreign patent or not. This was important under the first laws, but no such distinction exists under the act of

1870. This invention was patented in England, France, and Belgium on October 17, 1856, prior to the grant of the American patent, and the English patent had already expired. This point is fatal to the present application." Com. Dec. 1870, p. 131.

We have not been referred to any ruling of the Patent Office, after the passage of the act of 1870, in conflict with or different from that of Commissioner Fisher, except one made by Commissioner Paine in 1880. But in reference to the latter ruling and the construction of the act of 1870 under which the Commissioner of Patents had uniformly proceeded, Commissioner Marble, in a letter to the Secretary of the Interior, under date of March 17, 1882, said: "As will be seen by Col. Mason's communication, the construction now put upon the statute is the construction which it has received since it was enacted, except during a short interval of the term of my predecessor, Mr. Commissioner Paine. I may state, however, that Mr. Commissioner Paine addressed to me a letter within one month after he had retired from office, stating that he believed his construction of section 4887 was erroneous."

It is appropriate now to inquire as to the course of judicial decision upon the question before this court.

That question was directly presented in *Bate Refrigerating Co.* v. *Gillett*, 13 Fed. Rep. 553, 555, which case related to the patent here involved. Bate's application in Canada having been made *after* his application in this country, and the Canadian patent having been issued before the American patent was issued, the principal question was whether the invention was *patented* in Canada previous to the issuing of the patent in the United States in the sense in which the words "previously patented" were used in section 4887 of the Revised Statutes.

Referring to that section, Judge Nixon said: "The phraseology here used materially differs from the previous legislation on the subject. The power of the Commissioner of Patents is defined and abridged. Where a foreign patent has been granted for the same subject-matter, he is expressly required to limit the term of the domestic patent to the period of time

that the foreign patent has to run; or, if there be more than one, then to make it expire at the same time with the one having the shortest term. We do not see how any language could have been employed that would more clearly express the legislative design that the life of the domestic patent should expire with the term of any outstanding foreign patent. But the counsel for the complainant contended on the argument that the present case did not fall within the limitation of the statute, because the application for the United States patent was filed antecedent to the application for or the grant of the Canadian patent. We are at a loss to understand what the time of filing the application for the patent has to do with the matter. It is true that the eighth section of the act of 1836 and the sixth section of the act of 1839 made the date of filing the specifications and drawings in the one case and the date of the application for the home patent in the other the point of time from which to reckon the six months intervening between the issue of the foreign and domestic patent. It is also true that by section 4886, and the first clause of section 4887, of the Revised Statutes, an inventor is required to file an application for his patent within two years after his invention or discovery has been in public use or on sale, from all of which the late Commissioner of Patents (Paine) was led to the opinion that the word 'previously' used in the last clause of section 4887 had reference to the time prior to the filing of the application rather than to the time prior to the granting of the patent. See 17 O. G. 330. But this seems to be wresting the language of the section from its plain and obvious meaning, and we are not able to follow the reasoning by which such an interpretation is reached."

This decision was followed in *Gramme Electrical Co.* v. *Arnoux &c. Electric Co.*, (1883) 17 Fed. Rep. 838, 840, which turned upon the construction of section 25 of the act of 1870. One of the questions in that case was whether an American patent dated October 17, 1871, and the application for which was made August 17, 1870, was limited as to its term by the term of an Austrian patent issued *after* the American *application* was made, but before the American patent was issued.

Mr. Justice Blatchford, referring to section 25 of the act of 1870, said: "It is contended that under the foregoing provisions [patent] No. 120,057 expired either on December 30, 1871, or on December 30, 1880, the date of the expiration of the Austrian patent, accordingly as that patent is to be regarded as a patent for one year or for ten years. To this the plaintiff replies that the application for No. 120,057 was filed before the application for the Austrian patent was filed. But the date of the application for No. 120,057 cannot affect the question. Under the act of 1870 a patent takes effect from the time when it is granted and cannot be antedated. The meaning of section 25 of the act of 1870 is that the United States patent shall expire at the same time with the foreign patent having the shortest time to run, which was granted before the United States patent was granted, and not that it shall expire at the same time with the foreign patent having the shortest time to run, which was granted before the time when the application for the United States patent was made. *Bate Refrigerating Co.* v. *Gillett*, 13 Fed. Rep. 553."

There is nothing in the opinion delivered by Mr. Justice Blatchford which, in our judgment, justifies the suggestion that he felt constrained by principles of comity to follow the decision of Judge Nixon without considering the question upon its merits. He seems to have expressed his mature judgment as to the scope and meaning of the act of 1870.

The case of *Bate* v. *Gillett* came before Mr. Justice Bradley at the circuit in 1887, and what he said is reported in 31 Fed. Rep. 809. Referring to the construction given by Judge Nixon to section 4887, he observed that if the question were an open one he would have some hesitation, as it was one of considerable doubt. Expressly stating that he had not come to any decided conclusion on the subject, he declined, while sitting at the circuit, to modify the decision of Judge Nixon, and gave to it full effect. This court would undoubtedly attach great value to the deliberate judgment of Mr. Justice Bradley upon the question now before it — indeed, upon any question.

In *Edison Electric Light Co.* v. *U. S. Electric Lighting Co.,* (1888) 35 Fed. Rep. 134, 137, 138, the subject was carefully considered by Judge Wallace. In that case, which was a suit for the infringement of a patent, he said, after quoting section 4887: "The real inquiry is whether the section limits the term of a domestic patent to the term of a foreign patent when the application for the foreign patent is not made until subsequent to the application in this country, but the foreign patent issues before the domestic patent. If it were proper to treat this question as an original one, it would be necessary first to inquire whether there is any ambiguity in the language of the statute. If there is not, the duty of the court is to give effect to its obvious meaning, notwithstanding it may be thought to make an unreasonable and harsh innovation upon the preëxisting privileges of our own inventors. It is not only the safer course to adhere to the words of a statute, construed in their ordinary import, instead of entering into any inquiry as to the supposed intention of Congress, but it is the imperative duty of the court to do so. Where the meaning of the Revised Statutes is plain the court cannot look to the sources of the revision to ascertain whether errors have or have not been committed by the revisers. *United States* v. *Bowen,* 100 U. S. 508. There is no practical difference in the phraseology of section 4887 and that of section 25 of the act of July 8, 1870, from which the section is reproduced." Referring to the above cases at the circuit, he remarked that the question should not be considered as an original one.

In *Bate Co.* v. *Hammond,* 35 Fed. Rep. 151, Judge Colt followed the decision in *Bate Co.* v. *Gillett.* And a like ruling was made by Judge Coxe in *Accumulator Co.* v. *Julien Electrical Co.,* 57 Fed. Rep. 605.

In view of this history of the question presented by the certificate of the Circuit Court of Appeals, what is the duty of this court? In *Andrews* v. *Hovey,* 124 U. S. 694, 717, it was said that the construction of a statute of the United States concerning patents for inventions cannot be regarded as judicially settled when it has not been so settled by the highest judicial authority which can pass judgment upon the

question. "Nor," the court further said, "is this a case for the application of the doctrine that, in cases of ambiguity, the practice adopted by an executive department of the government in interpreting and administering a statute is to be taken as some evidence of its proper construction. The question before us as to the validity of a patent, by reason of pre-existing acts or omissions of the inventor, of the character of those involved in the present case, is not a question of executive administration, but is properly a judicial question. Although it may be a question which, to some extent, may come under the cognizance of the Commissioner of Patents, in granting a patent, yet, like all the questions passed upon by him in granting a patent which are similar in character to the question here involved, his determination thereof, in granting a particular patent, has never been looked upon as concluding the determination of the courts in regard to those questions respecting such particular patent, and, *a fortiori*, respecting other patents." The appellant, therefore, properly insists that the determination of the present question shall not be deemed absolutely concluded either by the practice that has obtained in the Patent Office since the passage of the act of 1870 nor by decisions in the inferior courts of the United States.

If section 4887 of the Revised Statutes is so worded as to express clearly the intention of Congress, the court must give effect to that intention. But even if the statute be not so explicit as to preclude construction; if upon applying to it the established rules of interpretation; if looking at it in the light of previous legislation on the subject; if there be reasonable ground for adopting either one of two constructions; this court, without departing from sound principle, may well adopt that construction which is in harmony with the settled practice of the executive branch of the government, and with the course of judicial decisions in the Circuit Courts of the United States; especially, if there be reason to suppose that vast interests may have grown up under that practice and under judicial decisions, which may be disturbed or destroyed by the announcement of a different rule.

Looking at the words of the statutes referred to, neither unduly enlarging nor unduly restricting their meaning, we are of opinion that Congress intended by the twenty-fifth section of the act of 1870, preserved in section 4887 of the Revised Statutes, to introduce a new test in respect of the term of an American patent where the same invention was the subject of a foreign patent previously issued. It has already been observed that the statutes relating to patents show upon their face that Congress always had in mind the difference between an application for a patent and the patent itself. And that difference is apparent in the act of 1870. We find there the words "application," "patent," "patented," "first patented," and "caused to be patented."

The inventor whom the act of 1839 was designed to protect was one whose invention had not been introduced into public and common use in the United States prior to his application for an American patent, and which had been "patented in a foreign country more than six months prior to his application." In reference to an American patent, granted under those circumstances, that act expressly declared that it should be limited to fourteen years — not, let it be observed, from the date of the American patent, but from the date or publication of the foreign letters patent.

The act of 1870 provided for the case of an inventor whose invention had not been introduced into public use in the United States for more than two years prior to his application, but which had been "*first patented* or caused to be *patented* in a foreign country." In such a case, that statute expressly provided that the American patent should expire with the foreign patent having the shortest term to run.

The case provided for by section 4887 of the Revised Statutes is the same as that provided for by the twenty-fifth section of the act of 1870, and the words "first patented or caused to be patented in a foreign country" in the first clause of that section are emphasized by the words in the succeeding clause, "previously patented" in a foreign country.

We cannot superadd, in section 4887 of the Revised Stat-

utes, the words "prior to the application" either after the words "first patented or caused to be patented in a foreign country," or after the words "previously patented in a foreign country," without defeating the intention of Congress as manifested by the language it selected to indicate its purpose. And the express command of the existing statute is that every American patent for an invention "previously patented in a foreign country," that is, "first patented or caused to be patented in a foreign country," shall expire at the same time with the foreign patent. No words are used that will justify the court in holding 'that an invention *patented* in a foreign country before being *patented* here, is to be exempt from the operation of the provision limiting the term of the American patent to expire with the foreign patent.

Was the Bate invention patented abroad before it was patented in this country? If so, the American patent expired with the foreign patent, and thereby the American public became entitled to use the invention from the time the foreign public were permitted to use it. Congress, in effect, by the existing law, says to an inventor seeking to enjoy the exclusive use in this country of his invention for the full term prescribed by law: "If your invention has not been introduced into public use in the United States for more than two years, you may, upon complying with the conditions prescribed, obtain an American patent, and you may, if you can, obtain a foreign patent. But the American patent will be granted on the condition that if you obtain the foreign patent first, your invention shall be free to the American people whenever by reason of the expiration of the foreign patent it becomes free to people abroad; but in no case shall the term of the American patent exceed seventeen years." This we deem to be a sound interpretation of the statute, giving to the words used the meaning required by their ordinary signification.

In our judgment the language used is so plain and unambiguous that a refusal to recognize its natural, obvious meaning would be justly regarded as indicating a purpose to change

the law by judicial action based upon some supposed policy of Congress. But, as declared in *Hadden* v. *Collector,* 5 Wall. 107, 111, " what is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes." "Where the language of the act is explicit," this court has said, " there is great danger in departing from the words used, to give an effect to the law which may be supposed to have been designed by the legislature. . . . It is not for the court to say, where the language of the statute is clear, that it shall be so construed as to embrace cases, because no good reason can be assigned why they were excluded from its provisions." *Scott* v. *Reid,* 10 Pet. 524, 527.

Undoubtedly the court, when endeavoring to ascertain the intention of the legislature, may be justified, in some circumstances, in giving weight to considerations of injustice or inconvenience that may arise from a particular construction of a statute. *Wilson* v. *Rousseau,* 4 How. 646, 680 ; *Bloomer* v. *McQuewan,* 14 How. 539, 553 ; *Blake* v. *Nat. Banks,* 23 Wall. 307, 320 ; *United States* v. *Kirby,* 7 Wall. 482, 486. It is, therefore, said that the time ordinarily intervening in other countries between the filing of an application and the granting of a patent is very short in comparison with the time ordinarily consumed in this country in obtaining a patent after the inventor has filed his application in the Patent Office, and, consequently, the statute — if construed as we have indicated its words reasonably require — might operate to the injury of an American inventor in that he will be deprived of so much of the statutory term of his American patent as will be in excess of the term of any foreign patent previously obtained for the same invention. If the statute thus construed does not give to the inventor all the benefits he would like to have, the remedy is with another department of the government, and it is not for the courts to tamper with the words of a statute or, by a strained construction of

legislative enactments, the language of which is clear and explicit, to accomplish results not contemplated by Congress. This court, speaking by Chief Justice Marshall, in *United States* v. *Fisher,* 2 Cranch, 358, 385, said that where the meaning of the legislature was plain "it must be obeyed."

Besides, the principle that limits an American patent to expire with a previous foreign patent covering the same invention was not first introduced by the act of 1870. It appears in the act of 1839 ; for it is there expressly declared that the American patent which the inventor shall not be debarred from receiving by reason of the invention having been patented in a foreign country more than six months prior to his application in this country, "shall be limited to fourteen years from the date of publication of such foreign letters-patent." While that act was in force the term prescribed for an American patent was fourteen years. And yet, according to its provisions, that time — if the inventor had a foreign patent antedating his American application by more than six months — was to be computed, not from the date of the American patent, but *from the date or publication of the foreign patent.* That principle is preserved in the existing law ; for, under the Revised Statutes, as under the act of 1870, if there be an American patent for an invention previously patented abroad, the former expires, not, it is true, at the expiration of any given number of years, as under the act of 1839, but at the time the foreign patent expires.

It is also said that the United States promised the inventor, when making his application, to give him a patent for the full term of seventeen years from the date of his patent, if, upon examination, it was found that he was entitled to one *at the time of such application;* and, consequently, that a curtailment of that term by reason of something occurring after the filing of the application, and for which he may not be responsible, is inconsistent with good faith upon the part of the government. Of course, this court would hesitate to accept any construction of an act of Congress that would imply bad faith upon the part of the government. But the contention just referred to assumes the very matter in dispute. It assumes

that the promise to the inventor was not accompanied by conditions authorizing the government to limit the term of its patent to some period less than seventeen years from its date. But if the promise to issue a patent is made with the reservation in the statute containing the promise that the patent, when issued, shall be limited to expire with any foreign patent previously issued for the same invention, then there is no basis for the suggestion that the enforcement of that condition violates any promise made to the inventor.

Another suggestion in behalf of the plaintiff is that in the case of a revision of statutes neither changes of phraseology nor a different arrangement of clauses in themselves show an intention to change or alter the existing law; that the new law should be held to mean what the prior law meant, unless a purpose to change or alter is manifested by clear, unambiguous language; and that, in the interpretation of any particular part of a revision, resort may be had to the previous law on the subject, whenever the revisers have not, in explicit language, disclosed their meaning. The circumstances under which the courts may look at prior laws, for which a revision has been substituted, are stated in *United States* v. *Bowen*, 100 U. S. 508, 513. That case depended upon the construction to be placed upon certain sections of the Revised Statutes. Mr. Justice Miller, speaking for the court, said: "The Revised Statutes must be treated as the legislative declaration of the statute law on the subjects which they embrace on the first day of December, 1873. When the meaning is plain, the courts cannot look to the statutes which have been revised to see if Congress erred in that revision, but may do so when necessary to construe doubtful language used in expressing the meaning of Congress." This principle was reaffirmed in *Vietor* v. *Arthur*, 104 U. S. 498; *Deffeback* v. *Hawke*, 115 U. S. 392, 402.; *Cambria Iron Co.* v. *Ashburn*, 118 U. S. 54, 57; *United States* v. *Lacher*, 134 U. S. 624, 627. For the reasons already stated, the principle announced in the cases just cited cannot avail the plaintiff if the existing statute is interpreted to mean what its words import according to their natural signification; for, the words used in sec-

tion 4887 of the Revised Statutes, as well as those in section 25 of the act of 1870, clearly evince the purpose of Congress to so curtail the term of an American patent (where the same invention is previously patented abroad) that it will expire at the time the foreign patent expires, even if the latter was applied for and granted after the filing of the American application but before the American patent issues.

But it is confidently asserted that the proceedings in Congress, relating to the bill which after numerous amendments became the act of 1870, show that Congress did not contemplate any such change in the law as is involved in the construction we have placed on the 25th section of that act.

It appears that the revisal of the statutes relating to patent and copyrights was reported to the House of Representatives by the commissioners appointed under the act of 1866, and was referred first to the House Committee on Revision of the Laws of the United States, and afterwards to the House Committee on Patents, of which Mr. Jenckes was chairman.

The different forms in which the section now in controversy appeared prior to the passage of, as well as in, the act of 1870 are thus indicated:

| *As reported by the Commissioners of Revision.* | *As reported by the Committee on Patents.* | *As finally adopted.* |
|---|---|---|
| § 25. No person shall be debarred from receiving a patent for his invention or discovery by reason of his having first patented it in a foreign country; *provided*, the same shall not have been introduced into public and common use in the United States prior to the application, and that the patent shall be limited to seventeen years from the date or pub- | § 25. No person shall be debarred from receiving a patent for his invention or discovery by reason of his having first patented it in a foreign country; *provided*, the same shall not have been introduced into public use in the United States prior to the application, and that the patent shall expire at the same time with the foreign patent, or if there be more than | § 25. No person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented in a foreign country; *provided*, the same shall not have been introduced into public use in the United States for more than two years prior to the application, and that |

| lication of the foreign patent. | one, at the same time with the one having the shortest term, but in no case shall be in force more than seventeen years. | the patent shall expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term; but in no case shall it be in force more than seventeen years. |

Now, it is true that, according to the report in the Congressional Globe of the proceedings in the House of Representatives, Mr. Jenckes said, when reporting that bill from the Committee on Patents, that the report of the revisers had been examined by the House Committee on Revision of the Laws of the United States, and "found to embody all the provisions of existing law, in brief, clear, and precise language." Congr. Globe 41st Congr. 2d Sess. Part 3, vol. 90, p. 2679. And it is claimed that other observations made by Mr. Jenckes on the same occasion tend to show that, in his opinion, the bill as reported by the revisers did not change the prior law.

These considerations, it is supposed, should have controlling weight in our interpretation of the act as it finally passed. We cannot assent to this view. If the act of 1870 was nothing more than a revision or consolidation of previous statutes on the same subject, there would be much greater force in the plaintiff's contention than there appears to be. But that act made numerous changes in the previous statutes, some of them of considerable importance. The Congress that passed the act of 1870 was not restricted to mere revision or consolidation, even if the act of 1866 be construed as contemplating only the revision and consolidation of previous statutes without material change. But whatever may have been the scope of the act of 1866, the purpose, in the act of 1870, to go beyond revision and to amend the existing statutes, is manifest from the title of that act, and from the bill that came from the House Committee on Patents. When that bill, as it passed the House, reached the Senate, various amendments were made in that body. And upon the face of the act, as it finally passed, there are such altera-

tions of the prior law as to impose upon this court the respon-
sibility of determining the effect of such alterations. We cannot
accept as controlling, much less conclusive, the opinion of the
House Committee on the Revision of the Laws of the United
States, as reported by Mr. Jenckes, that the bill it reported em-
bodied only the existing law. Nor can we assume that the
House of Representatives, much less the Senate, based their
action upon the opinion of individual members of the House as
to the scope and legal effect of the report of the revisers. Com-
paring the bill reported by the revisers and the bill reported
by the House Committee on Patents, with the act as it passed,
we find it impossible to sustain the view taken by the plaintiff.

It is quite true, as the plaintiff contends, that Congress did
not intend by the act of 1870 to upturn the entire policy of
the government in reference to patents; but, beyond all ques-
tion, its final action shows that it made and intended to make
important amendments of existing laws.

The revisers, as well as the House Committee on Patents,
proposed that it should be a condition of the protection of an
American patent, where the same invention had been first
patented in a foreign country, that the invention should not
have been introduced into public use in the United States
" prior to the application." The bill as it passed Congress
made it a condition that the invention should not have been
introduced into public use in this country " for more than two
years prior to the application."

The revisers proposed that the patent should run seventeen
years from the date or publication of the foreign patent;
whereas, the House Committee on Patents proposed, and it
was so declared in the act as passed, that the American patent
should in no case be in force beyond seventeen years, and
should " expire at the same time with the foreign patent, or,
if there be more than one, at the same time with the one
having the shortest term."

The revisers, the House Committee on Patents, and Con-
gress, all had in view the rights of the inventor at the time
when he was to receive or be debarred from receiving a patent
for his invention, and not his apparent rights at the date of his

application.   Hence the words " by reason of the same having
been patented in a foreign country *more than six months prior
to his application,*" as found in the act of 1839, were changed
in the report of the revisers and in the report of the original
bill presented by the House Committee on Patents, so as to
read " by reason of his having first patented it in a foreign
country."

We cannot adjudge that the words " more than six months
prior to his application," in the act of 1839, were carelessly
dropped, or that Congress did not have in mind the difference
between a clause declaring that an inventor should not be
debarred from receiving a patent for his invention " by reason
of the same having been patented in a foreign country more
than six months prior to his application," and a clause declar-
ing that he should not be so debarred " by reason of its [the
invention] having been first patented or caused to be patented
in a foreign country."   We have no authority to add to the
clause last quoted the words " prior to his application."   To
do so would be to legislate, and not to interpret and give effect
to the statute as passed by Congress.

Much has been said about the intention of Congress, as
manifested by its legislation, to deal liberally with inventors,
especially those who were citizens of the United States.   This
is true.   But it is for Congress to prescribe the conditions
upon which it will secure to inventors the exclusive right to
their inventions.   What may be due to inventors is a matter
about which there may well exist differences of opinion.   It
is the province of the legislative branch of the government to
say when a patent to an inventor shall expire, and, therefore,
when the public may enjoy, without charge, the benefit of the
invention covered by it.   We can very well understand how
the existing statute may, in some circumstances, operate inju-
riously to an American inventor who, in addition to the exclu-
sive rights granted to him in this country for the term of sev-
enteen years, wishes to secure a monopoly for his invention in
other countries ; for, if he obtains foreign patents for his inven-
tion before obtaining one here, the American patent is limited
by law, whether it is so expressed or not in the patent itself,

to expire with the foreign patent having the shortest term. This is the case as it appears from the standpoint of the patentee, without regard to the interests of the American public.

But it is to be remembered — at least it may be assumed that Congress was advised — that action by the Patent Office upon applications for patents was often unduly and purposely delayed by applicants until they could reap the full benefit of the monopoly obtained by them in foreign countries before taking out an American patent. "In the meantime," the Commissioner of Patents, in his annual report as late as 1887, said, "they [applicants for American patents] are engaged in manufacturing and putting upon the market the article or improvement, but warning the public that the patent is applied for, the effect of which is to give them the absolute control and monopoly of the invention and to deter all other inventors from entering upon the same field of invention and from manufacturing the article."

We need not say whether these considerations were or were not sufficient to induce the change first made by the twenty-fifth section of the act of 1870 and perpetuated in the existing statute. They are referred to only as showing what Congress may have had in view when it provided, as it did, that an invention covered by a foreign patent, obtained or caused to be obtained before an American patent is granted for the same invention, should be free to the American public as soon as it became by reason of the expiration of the foreign patent free to the people of other countries. If this principle operates harshly upon inventors in certain cases, it is for Congress, whose discretion is not subject to judicial control, to make provision for those cases, if it be possible to do so without such injury to the people of our country as ought not to be inflicted upon them.

And it may be stated, in this connection, that Congress allowed the twenty-fifth section of the act of 1870 to stand, although the Commissioner of Patents, immediately after the passage of that act, ruled that it had changed the prior law so as to limit an American patent to expire at the same time

with the foreign patent of the shortest term covering the same invention and issued before the American patent, although after the application therefor was made. If, as is insisted, the change was not intended, and was effected only by words incautiously used, or not used with any purpose to introduce a new rule for the limitation of the term of an American patent, some action upon the subject, it may well be assumed, would have been taken by Congress after the passage of the act of 1870.

The Revised Statutes of 1874 were adopted, it must be presumed, with the knowledge on the part of Congress of the construction previously placed by the Patent Office upon the twenty-fifth section of the act of 1870. This presumption is strengthened by an examination of the act approved February 18, 1875, entitled "An act to correct errors and to supply omissions in the Revised Statutes of the United States." 18 Stat. 316, c. 80. That act, upon its face, shows that the entire revision of 1874, after it took effect, was carefully re-examined for the purpose of ascertaining whether there were errors or omissions in the work of revision. Now, it is inconceivable that the difference in the wording of the twenty-fifth section of the act of 1870 or of section 4887 of the Revised Statutes, when compared with the act of 1839, could have escaped the attention of Congress, especially as the act of 1870 had been interpreted as introducing a new rule in respect of the term of an American patent, where the same invention was covered by a foreign patent previously issued. The act of 1875, for the purpose of correcting errors and omissions, amended or repealed nearly seventy sections of the Revised Statutes. Still further — as an examination of the statutes will show — since the Revised Statutes went into operation nearly eight hundred sections, other than those referred to in the act of 1875, have been amended or repealed. But no amendment has ever been made of section 4887.

The rule prescribed by the twenty-fifth section of the act of 1870 having been reproduced in section 4887 of the Revised Statutes, and the latter section never having been amended, we ought not, after the lapse of nearly twenty-five years from

the passage of the act of 1870, place upon its twenty-fifth section, or upon section 4887 of the Revised Statutes which took its place, any interpretation other than that which the ordinary, natural meaning of their words import.

· Our answers, therefore, to the questions certified are that —

*Under the facts stated, the invention for which the United States patent to Bate was issued was "previously patented in a foreign country," within the meaning of those words in section 4887 of the Revised Statutes, and the United States patent expired, under the terms of that section, before the expiration of seventeen years from its date, and it is so certified to the Circuit Court of Appeals.*