Campbell, Ghief Justice,
delivered the opinion of the court:
Early in 1907 the Postmaster General issued an order, No. 165, which was modified in June, 1907, whereby he gave notice to the claimant and other railroad companies engaged in carrying the mails that for the quadrennial term commencing July 1, 1907, he would use for a divisor in ascertaining the average daily weights of the mails the whole number of days included in the weighing period. By this was meant that he would use as the divisor 105 days, that being the number of days, including Sundays, comprised within the period of 90 successive working days. The claimant company claims that the mails should have been weighed for 105 days, the aggregate of these weighings taken as a dividend and 90 taken as a divisor and the quotient be accepted as the average weight per day, insisting that such had been for over 30 years the practice of the department under the act of 1873, 17 Stat. L., 558, which provides that an average weight of mails per day carried the whole length of the railroad route shall be ascertained in every case by an actual weighing of the mails for such a number of successive working days, not less than 30, as the Postmaster General may direct. By the amendment of 1905 the 30 mentioned in the act of 1873 was *490 changed to 90. Claimant has been paid quarterly since July, 1907, upon, the said basis of 105 for a divisor, but claims that by the use of 90 as a divisor it would have received much more, and this difference furnished the claim sued upon here.
The principal question, therefore, is upon the construction of the act of March 3, 1873, and the several acts amendatory thereof, which are set out in the footnote.[1]
*491 A ruling on the demurrer filed to the original petition is unnecessary, it having been waived, because both parties file requests for findings of fact.
Two propositions urged by the claimant will be first noticed :
(a) Contemporaneous and long-continued exposition by the Post Office Department. (5) That recourse should be had *492 to debates in Congress, reports of committees, and the failure of Congress to change the departmental practice.
(A) Eelative to the effect to be given to a contemporaneous or practical exposition of an act of Congress by the executive department charged with its execution where that construction has been used for many years in the conduct of public business contemplated by the act certain rules are deducible from the authorities:
1. That “ in the construction of a doubtful and ambiguous law the contemporaneous construction of those who were called upon to act under the law and were appointed to carry its provisions into effect is entitled to very great respect,” Edward’s Lessee v. Darby, 12 Wheat., 206, and ought not to be overruled without cogent reasons, Brown’s case, 113 U. S., 568, and may be accepted as determining its meaning. Hammer’s case, 221 U. S., 226. See United States v. Alabama Great Southern R. R. Co., 142 U. S., 621, and cases cited in margin in Fairbanks case, 181 U. S., 307-308.
2. That where property rights have been arisen or contracts been made under departmental construction of a statute of doubtful meaning the courts will adopt that construction rather than interfere with the vested property or contract rights. New York, etc., R. R. Co. v. Interstate Commerce Commission, 200 U. S., 361; Union Pac. Co. v. Snow, 231 U. S., 204-213; Webster v. Luther, 163 U. S., 331, 342; Bate Refrigerator Co. v. Sulzberger, 157 U. S., 1, 34; United States v. Alabama Great Southern R. Co., 142 U. S., 621.
3. That departmental or contemporaneous practical construction being resorted to in aid of interpretation “is not allowable to interpret what has no need of interpretation,” and unless the statute is ambiguous or doubtful no erroneous construction by a department charged with its execution, however long continued, will affect the meaning of the stat *493 ute or influence the court’s ascertainment of the true meaning. Graham's case, 110 U. S., 119; Houghton v. Payne, 194 U. S., 88, 99, and cases there cited; Robertson v. Downing, 127 U. S., 607; Dickson case, 15 Pet., 141; Webster v. Luther, 163 U. S., 331, 342.
These views are sustained by Fairbanks v. United States, 181 U. S., 283, where the authorities are collated and reviewed and wherein the court says, p. 306:
“ From this résumé of our decisions it clearly appears that practical construction is relied upon only in cases of doubt. We have referred to it when the construction seemed to be demonstrable, but then only in response to doubts suggested by counsel. Where there was obviously a matter of doubt, we have yielded assent to the construction placed by those having actual charge of the execution of the statute, but where there was no doubt we have steadfastly declined to recognize any force in practical construction. Thus before any appeal can be made to practical construction, it must appear that the true meaning is doubtful.”
(B) Another proposition urged for the claimant is that in constructing the act of 1873 and acts amendatory thereof the court should have recourse to the debates in Congress, reports of committees, and the failure of Congress to change the departmental practice, especially when amendments were offered having in view the change of the practice then obtaining in the Post Office Department, to ascertain the average weights carried per day by trains operating seven days per week.
The question arose in Aldridge v. Williams, 3. How., 9, where the court was called upon to construe provisions in the act of March 2,1833, relating to tariff duties called the compromise act, and in the opinion of the court, delivered by Mr. Chief Justice Taney, it is said:
“In expounding this law the judgment of the court can not in any degree be influenced by the construction placed upon it by individual Members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both Houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used, comparing it, when *494 any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed.”
This case is cited in United States v. Freight Association, 166 U. S., 290, 318, where the reason for discarding consideration of debates, etc., in construing an act is thus stated by the court:
“The reason is that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did; and those who spoke might differ from each other; the result being that the only proper way to construe a legislative act is from the language used in the act and, upon occasion, by a resort to the history of the times when it was passed.”
See also United States v. Union Pacific R. R. Co., 91 U. S., 72, 79; District of Columbia v. Washington Market Co., 108 U. S., 243; Maxwell v. Dow, 176 U. S., 581; Dunlap v. United States, 173 U. S., 65, 75; Knowlton v. Moore, 178 U. S., 41, 72.
In Bate Refrigerator Co. v. Sulzberger, 157 U. S., 1, 42, the court said it could not “ accept as controlling, much less conclusive, the opinion of the House Committee on the Revision of the Laws of the United States, as reported by Mr. Jenckes, that the bill it reported embodied only the existing law.”
To the same effect is Penna. R. R. Co. v. Internat'l Coal Co., 230 U. S., 184; Omaha Street Rwy. v. Interstate Com. Comm., 230 U. S., 324, 333.
Other cases, some of which may at first view be thought to qualify the rule easily deducible from the foregoing authorities, may be collected as follows:
In Binns v. United States, 194 U. S., 486, 495, it is said:
“ While it is generally true that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of the statute passed by that body, United States v. Freight Association, 166 U. S., 290, 318, yet it is also true that we have examined the reports of the committees of either body with a view of determining the scope of the statutes pased on the strength of *495 such reports, Holy Trinity Church v. United States, 148 U. S., 457, 464.”
In Holy Trinity Church v. United States, 143 U. S., 457, the court considered the effect of the act of February 26, 1885, prohibiting the importation and -migration of aliens under contract to perform labor in the United States, and in the course of the opinion, delivered by Mr. Justice Brewer, refer to and quote from a report of the Senate committee recommending the passage of the act, speaking of it as “ a singular circumstance, throwing light upon the intent of Congress,” and further along says: “We find, therefore, that the title of the act, the evil which was intended to be remedied, the circumstances surrounding the appeal to Congress, the reports of the committee of each Blouse, all concur in affirming that the intent of Congress was simply to stay the influx of this cheap, unskilled labor.”
In Standard Oil Co. v. United States, 221 U. S., 1, 50, a reference was had to the debates, Mr. Chief Justice White delivering the opinion, and saying:
“Although debates may not be used as a means for interpreting a statute, United States v. Freight Association, 166 U. S., 318 and cases cited, that rule in the nature of things is not violated by resorting to debates as a means of ascertaining the environment at the time of the enactment of a particular law — that is, the history of the period when it was adopted.”
The claimant relies upon the Alexander case, 12 Wall., 177. A widow of a Revolutionary soldier brought suit for what was claimed to be arrears of pension due her under the act of 1853. The act of July 29, 1848, had authorized the payment of pensions to widows of soldiers and marines married ~before January 1,1800, to commence the 4th of March, 1848. The act of February 3,1853, authorized pensions to widows of soldiers married after January 1, 1800, but omitted any reference to widows of mariners and marines. A subsequent act, February 28, 1855, extended the operation of the act of 1853 to widows of mariners and marines, giving them pensions in “ the same manner and to the same extent ” as widows of soldiers under the act of 1853. Mrs. Alexander claimed that the act of 1853, by which her right to a pension was controlled, should be construed with reference to the *496 prior act of 1848, and that her pension should date from the latter act.
Mr. Justice Strong, delivering the opinion of the court, said it was clear that if the act of 1853 stood alone no widow could be entitled to a pension under it commencing anterior to its passage, because “all statutes are to be construed as operating prospectively unless a contrary intention appears beyond doubt.”
Turning to the contention that the act of 1853 should be construed with reference to that of 1848, he points out that it does not profess to be an amendment to that act and has no necessary reference to the latter; and while it was true that the act of 1853 declared that the said widows shall be entitled to pensions in the same manner as those referred to in the act of 1848, it was said: “ Certainly such a direction is not inconsistent with our holding that the act of 1853 was not intended to have a retroactive effect or to confer a right to a pension commencing prior to its passage.” It is then declared that the question could not be regarded as an open one, and that immediately after the passage of the act the Commissioner of Pensions had construed it as granting pensions commencing from and after its passage, which construction had ever since been adhered to by the Pension Bureau. Then it is said: “ That such was its meaning seems also to have been the understanding of the next succeeding Congress after it was enacted,” and the opinion proceeds to discuss pertinent parts of said three acts, calling attention to the fact that the act of 1855 granted pensions “ in the same manner and to the same extent ” as the act of 1853, and saying that thus “measuring the extent by the grant made in 1853 and not by that of 1848 tends to show that Congress regarded the extent or commencement of the pension under the act of 1853 as different from that of those granted by the act of 1848.” Proceeding, it is said: “And this is made quite certain by the history of the legislation,” the opinion pointing out that when the act of 1855 was first proposed it contained a provision quoted which would have directed that pensions granted by the act of 1853 should commence March 4, 1848. “This provision,” it is said, “was intended to change the construction *497 which the Commissioner of Pensions had given the act of 1853, but it was stricken out and the statute was enacted as it stands. The intention of Congress was thus • clearly manifested to adopt the construction of the act of 1853 which had been given it by the Pension Bureau, and we are hardly at liberty now to interpret it differently.” Concluding, the opinion says: “ In view of this action of Congress and the long-standing construction of the act given by the department whose duty it was to act under it, we are of opinion that the plaintiff’s intestate was not entitled to a pension commencing anterior. to February 3, 1853.” The case had been decided in 1868 by the Court of Claims and was decided by the Supreme Court in 1870, over 17 years after the passage of the act in question, which had uniformly been given by the Pension Bureau the construction which the Supreme Court held to have been a proper one.
As the case is relied upon here because of its expressions as to the adoption by Congress of a departmental construction, it may be of interest to note a somewhat detailed history of the act of 1855 referred to in the opinion in said case (30 Cong. Globe, 92), as illustrative of the difficulty and uncertainty that must attend any attempt to construe statutes by referring to debates or views of individual Members or the action of one House of Congress not concurred in by the other. The House had passed the invalid pension bill, and while it was under consideration in the Senate (30 Cong. Globe, 81), Senator Fessenden offered as an amendment to it section 3, being the part referred to above as the act of 1855, his proposed amendment containing the provision “ and the pensions granted by this act and those under said second section of the act of February 3, 1853, shall commence on the 4th of March, 1848.” It will be noted that the provision applied not alone to pensions granted by the act of 1853, but to those granted by the proposed act of 1855 as well. The amendment was objected to by Senator Hunter, because it was new legislation upon an appropriation bill, and considerable expression of views was given by different Members — Senators Fessenden, Stuart, Hunter, Chase, and Brown. Senator Adams made a point of order, which was overruled, and the discussion was continued by Sena *498 tors Hunter, Brown, Weller, Toombs, Cbase, Dawson, and Fessenden, some contending that the matter should be carried in a different bill, others that it was proper to put it on the appropriation bill, all but one expressing sympathy with the general purposes of the amendment, and one only referring to the bureau’s construction of the act of 1853. Senator Chase said: “ There is, however, an extension by the amendment in both these classes of cases conformable to the idea originally entertained by those who supported the provision in favor of the widows of officers and soldiers in the Army. Their idea was that those pensions should commence from 1848. The construction of the Government officers, I believe, makes them commence from 1853. In both these cases the pensions are made to commence from 1848. That is the only change, and that simply carries out the purpose of the Senate and of Congress in passing the original provision.” A vote was taken and the amendment was adopted with said provision in it, 30 Cong. Globe, 94, by a vote of 19 to 18. The bill as amended was then adopted and went back to the House. The Senate had adopted two amendments to the House bill, and as amended the bill was called up in the House on January 9,1855, 30 Cong. Globe, 217, by Mr. Houston and the first Senate amendment was readily agreed to. When the second amendment was offered, the one in question here, a Member proposed an amendment to the Senate amendment which, however, did not affect its purpose but was an extension of the pension laws to other cases. These amendments were subsequently referred to the Ways and Means Committee, which later, on February 9, reported back recommending the adoption of the first part of the Senate amendment and the rejection of the latter part, the provision above quoted. In reporting this Senate amendment from the Ways and Means Committee Mr. Houston explained that it had two objects, one to put widows of sailors on an equality with widows of soldiers and the other to extend the law of 1853 so as to make pensions commence in 1848. The committee advised the adoption of the first branch of the amendment, and as to the latter branch Mr. Houston said: “ But if the latter part of it be agreed to, it will, according to the letter of the Commissioner of Pensions, *499 require $1,000,000 to commence the extension. The committee therefore recommend that the amendment of the Senate be amended by striking out the words ‘ and the pensions granted by this act and those under said second section of the act of February 3, 1853, shall commence on the 1st day of March, 1848.’ I now move the previous question.” And the amendment was agreed to. 30 Cong. Globe, 656. When the bill as thus amended went back to the Senate the House amendment was vigorously opposed by Senator Hamlin upon the ground that, as he and other Senators understood at the time of its passage the act of 1853 was intended to relate back to 1848; that he had hastily drawn the amendment in 1853, which was then adopted, intending to make the pensions date from 1848; that the then Commissioner of Pensions had indicated he would so construe the statute, but a subsequent commissioner had construed it differently, and that therefore the Senate should not concur in the House amendment. A letter from the commissioner was read, showing not only the bureau’s construction of the act of 1853 but also the necessary increase in amount of the pensions, calling for additional appropriations, if the proposed act extended the prolusions of the act of 1853 back to 1848. But the House amendment was agreed to and the bill passed. 30 Cong. Globe, 878. It may be said, in view of said history, as was said in Freight Association case, 166 U. S., 318: “All that can be determined from the debates and reports is that various Members had various views.”
Several conclusions are apparent from the opinion in said case — (1) that the meaning of the act (that it was prospective and not retroactive in its operation) was definitely ascertained from its terms by the court; (2) that upon consideration of the act in connection with two others the intention of Congress as to said act was ascertained to coincide with the court’s view of the meaning of the act; (3) that this latter cQnclusion was “made quite certain by the history of the legislation.”
We do not think, therefore, that the Alexander case is an authority upon the question of congressional adoption of departmental construction of an act if that construction be erroneous, because in that case the court holds the construe *500 tion to have been a correct one. Whether the court would have felt bound by the Pension Bureau’s construction if it had been erroneous is answered by the other authorities sufra.
The said cases referred to in this connection, commencing with Binn’s case, supra, do not tend to abridge the well-established rule that debates, committee reports, and opinions of individual Members of Congress can not be considered as interpreting the meaning of statutes enacted by Congress, but they do recognize that such debates, etc., may be consulted in the ascertainment of the history of the period. And while in some of the cases mentioned references will be found to reports and debates and, as in the Alexander case, to a rejection of a proposed amendment, it will be found that these references were not made by the court in order to ascertain the meaning of an act, but rather and usually arguendo as vindicating and confirming the conclusion which the court would and did reach without having recourse to such extrinsic matters to enable it to reach its conclusion. See McLean case, 226 U. S., 374, 380. And it is clear that in said cases the references had relation to proposed statutes that were being considered and were enacted, and not to discussions, debates, rulings, or reports with reference to statutes or amendments of statutes which were not enacted or adopted. And the debates and reports to which we are asked to look occurred in 1907, when the amendment then adopted was enacted, and not in 1905, when the act of 1873 was amended by requiring weighings for not less than 90 successive working days, which latter is the material one here.
By the act of July 2, 1838, 5 Stat. L., 288, every railroad in the United States then or thereafter completed was declared to be “ a post route,” and the Postmaster General was directed to “ cause the mails to be transported thereon, provided he can have it done upon reasonable terms and not paying therefor in any instance more than 25 per cent over and above what similar transportation would cost in post coaches.”
By the act of January 25, 1839, 5 Stat. L., 314, a limit of not exceeding $300 per mile per annum was placed upon the *501 payment to railroad companies “ for the conveyance of one or more daily mails upon tbeir roads.”
By the act of February 20, 1845, 5 Stat. L., 738, the Postmaster General was authorized to contract with railroads for transporting the mails without advertising for bids. By that act it is provided:
“ Sec. 19. And he it further enacted, That to insure, as far as may be practicable, an equal and just rate of compensation, according to the service performed, among the several railroad companies * * * for the transportation of the mail, it shall be the duty of the Postmaster General to * * * divide the railroad routes * * * into three classes, according to the size of the mails, the speed with which they are conveyed, and the importance of the service.”
The act approved June 8, 1872, 17 Stats., 283, was an act to revise, consolidate, and amend the statutes relating to the Post Office Department, and by section 265 the Postmaster General was authorized to enter into contracts with railroad companies for carrying the mails without advertising for bids therefor, thus bringing forward the provisions of the act of 1845.
No further legislation occurred until 1873, and the mails had been carried under the provisions of said acts under contracts made by the Postmaster General with the respective roads. It was made that official’s duty by the act of 1845 to divide the railroad routes into three classes, and it is to be noticed that by this act “the size of the mails” was made one of the important elements in the road’s classification, though no method of its definite ascertainment was pointed out. It was not until 1867 that the plan was suggested of having the mails weighed for 30 consecutive working days with the view of securing data upon the “ size of the mails,” and securing the average weight per day. But the compensation being paid was regulated by the act of 1845. That act, authorizing the Postmaster General to divide the postal routes into three classes, fixed the maximum rate he could pay per mile per annum for the transportation at no higher rate than $300 per mile for routes of the first class, no greater compensation than $150 per mile for routes of the second class, and no greater compensation than $50 *502 per mile for routes of the third class. The classification was left to his judgment and discretion, with the direction of that statute, that in making it he should have regard to “ the size of the mails, the speed with which they are conveyed, and the importance of the service,” having in view also that a purpose of the law was “ to insure, as far as may be practicable, an equal and just rate of compensation according to the service performed.” The elements of size, speed, and importance of the service thus entered into his consideration, but the statute did not define these, and the application of the rules which should guide him, if they may be so called, was to be made by the Postmaster General. If he could not conclude contracts “ at a compensation not exceeding the aforesaid maximum rates or for what he may deem a reasonable and fair compensation for the service to be performed,” he was authorized to contract for transportation by other means.
Between 1845 and 1873 great development had occurred in the country, and in railroad building as well. The amount of the mails and the importance of the service had vastly increased and the system of handling the mails had become a complex one. Over some railroad routes mails were carried one or more times per day every day in the week; on others six times per week; on others less than that. Some routes were long and others short.
Let us examine this act of 1873. We find (1) that it appropriates a large amount “ for increase compensation,” thus recognizing that the plan adopted for ascertaining the average weight per day was expected to result in increase of compensation; (2) that payments are to be made on the basis of average daily weight per mile — thus answering the question of “long haul” and “ short haul”; (3) that a scale of maximum rates is given to be based upon the average obtained from actual weighings “ in every case,” for 30 or more successive working days; (4) that a rule for ascertaining an average weight per day is provided. This last marks a departure from the older law wherein no method of ascertaining “the size of the mails” is provided, though it was required by the act of 1845 that it enter into the Postmaster General’s computation in fixing pay for the service. It was *503 as impracticable in 1873 and the years following to ascertain the size of the mails or their weight as it had been in prior years, except by constant weighings, and as the weight carried was necessarily considered a material element a plan was adopted which was at once practicable and fair to the parties concerned. This plan amounted to discarding the idea of actual weights by providing a contract basis to be an average ascertained by a rule stated in the statute, and it will be observed that the statute directs the average weights to be ascertained “in every case” by that rule. With the average weight carried daily throughout the route ascertained, the length of the route known, the right to “ increase compensation” given, and the maximum rate named, the Postmaster General was prepared to submit his proposal to each road with the conditions and terms provided in the act. Among the conditions named were that the mails be carried with “ due frequency and speed,” and that proper and suitable mail cars be provided.
He was given a limit as to compensation to be paid, maximum rates being stated, and his contract was to be based upon an average weight of mails per day carried the whole length of the route and the ascertainment therefrom of the average weight carried per mile per annum.
The statute left many matters to be worked out by the Post Office Department calling for the exercise of discretion and judgment. We point out some and perhaps many others occur in the practical operation of the law. For instance:
1. The amount of compensation to be paid in any case is not fixed, but the maximum that can be paid is stated.
2. What shall be regarded as “ due frequency and speed ” is left open.'
3. The suitableness of the mail cars employed was left for consideration.
4. The adjustment of the maximum rates allowed to the varying average weights of all above or below the figures mentioned in the scale of prices had to be made, because while the statute allowed a maximum rate of $50 per mile to a route carrying its whole length an average of weight of mails per day of 200 pounds, the next figure stated is 500 pounds, for which a maximum of $75 was allowable. How *504 much was allowable where the average weight proved to be 300 pounds- or exactly 375 pounds ?
5. Different roads carrying the mails on different days— some for seven days, some for six days, some for less days per week — were to be treated with accordingly.
6. The additional amounts allowed for railway post-office cars were not definitely fixed.
7. The times of the year the weighing should occur are not stated.
The principal point in dispute in this case is involved in what is called “ the divisor ” to be used in ascertaining the average weight contemplated by the statute, its language being—
The average weight to be ascertained in every case by the actual weighing of the mails for such a number of successive working days, not less than 30, at such times * * * as the Postmaster General may direct.
Since the statute mentions working days, some meaning should be ascribed to the terms. It would have shortened the phrase to have omitted the word “ working,” but it was inserted. Working days generally refer to secular days; that is, they exclude Sundays. It was said in a case involving the use of the term in a charter party: “ The expression ‘working days’ has in commerce and jurisprudence a settled and definite meaning; it means days as they succeed each other, exclusive of Sundays and holidays. The court gives this precise and formal definition in Brooks v. Minturn, 1 Cal., 483.” Pederson v. Engster, 14 Fed. R., 422; Field v. Chase, N. Y., Lalor’s Supp., 50. Working day is a day in which work is generally done in distinction to Sundays or holidays. Webster’s Dictionary. We may not find an entirely satisfactory reason for the use of the expression in said connection, and it is immaterial what the reason was if the meaning be clear. Congress certainly had the right to use it and did so. At that time, 1873, there were a great many more railroad routes carrying the mails six days per week than there were carrying them seven days per week. We are told the proportion was then 7 to 1, a condition very much changed since. It may, therefore, be that Congress recognized that by using the working days — or *505 excluding Sundays — for weighings it was adopting days common to all the roads, and thus securing an average weight fairly representative of the service of all, the daily average being the factor desired. Or it may be that the suggestion was made that the railroads were operated under charters granted by the States, which might claim the right to regulate or prohibit the running of Sunday trains, and that the authority from Congress to weigh the mails on Sundays might be construed as legislation by Congress in reference to the mails, a matter peculiarly within the province of the Federal Government, and as thereby interdicting any interference by the States with railroads operating their trains on Sundays while carrying the mails. Whatever the ■ reason, Congress directed that the mails be weighed for such a number of successive working days, not less than 30, as the Postmaster General might direct.
Having in mind the fact that prior to 1873 much difficulty had been experienced in determining “the size of the mails,” that actual weights could only be found by constant and actual weighings, which would be so expensive and inconvenient as to amount to impracticability, and that it was essential to have a basis upon which contracts for terms of fours years could be made, we can see a reason for adopting the plan of ascertaining an average weight and accepting that instead of actual weight. If Congress had directed, as it could readily have done, that the mails should be actually weighed on Monday, Wednesday, and Friday of one week and on Tuesday, Thursday, and Saturday of the next week, and so on for five successive weeks, and the average of these weighings be taken, no one would doubt that 15 days’ weighings would be divided by 15 to obtain the average. It should be borne in mind that the evident purpose of the statute was to furnish a plan whereby the average weights in distinction to actual weights could be found; that it was adopting a method under which the Government would be willing to make contracts extending for a long period; that certainty, even though based upon average weights, was preferable to uncertainty resulting from any other method; that this certainty of average weight would furnish a basis for estimates for appropriations relieving *506 the uncertainty of estimating weights or the variableness of actual weights; and that it therefore provided a plan and furnished a rule which, if literally followed, would determine the average weight per day.
The statute authorized a readjustment of the compensation upon “the conditions and terms” mentioned therein. One of these conditions is that in the matter of weights the statutory rule shall be used to find the average weight of the mails carried per day. The aggregate of “ the actual weigh-ings of the mails for such a number of successive working days not less than 30 * * as the Postmaster General may direct, furnishes the dividend, the number of successive working days so used furnishes the divisor; and the quotient is, of course, the average daily weight of the mails carried on said days.
At this point it is suggested by claimant that the foregoing rule might serve for six-day roads, but works an injustice to routes carrying mails every day of the week. Because, it is said, when the mails carried by six-day roads are weighed for 30 successive working days it means that all of the mail carried throughout the week by such roads goes to make up the average — Sunday’s accummulation going into Monday’s mail and weight; while the seven-day roads carrying mails on Sunday do not get the benefit of its weight in this aVerage. At first view this contention may seem to have merit, but in reality it is unsound when the whole statute is considered.
Congress knew when it enacted the statute that some routes were seven-day and others were six-day routes, and yet it provided a rule which it declared should be applied “in every case” by actual weighings of the mails for a number of successive working days. But chiefly the vice of said contention is that, in order to show the supposed inequality produced by the rule stated specifically in the statute, the emphasis is laid upon the wrong feature. The statute itself considered as an entirety answers the contention, for it provides that, among the terms and conditions upon which the mails are to be carried, there shall be prominently considered the “ frequency ” with which they are conveyed and that the price to be paid shall be within a *507 named maximum price. In other words, the latitude given the Postmaster General within which to “ readjust ” the compensation so as to comply with the terms and spirit of the act of 1873 is not found in a disregard of the rule for finding the average weight, but is found in the price to be paid. He may pay on the basis of “ due frequency ” of carriage to seven-day roads a larger amount for the average daily weight per mile per annum than he pays a six-day road. He may pay one for 365 days and the other for 313 days per annum. And this can be done because of the flexibility of the provisions fixing the compensation without doing any violence to any terms of the statute.
It is, however, insisted that the contemporaneous exposition of the statute given by the Post Office Department is contrary to the view above expressed, and that from 1873 to 1907 the department, in the execution of the law, pursued the course of weighing the mails for 30 successive working days and for the five intervening Sundays, taking the total of the 35 weighings, dividing it by 30 and using the quotient as the daily weight carried by the seven-day roads. -
If the statute in this particular were ambiguous or doubtful, the exposition by the department so long continued should be given great weight and a controlling effect under the authorities sufra, but we do not so construe the statute.
If the ascertainment of the weight by the departmental method was because of any discretionary power granted by the statute, that discretion must be held to have existed in each successive Postmaster General and still to continue.
But it is insisted that by the amendment of 1905, if not by prior amendments to the act of 1873, Congress reenacted that statute, and that when a statute is reenacted without change the construction which had been given it is carried into the reenactment. United States v. Hermanos y Compania,, 209 U. S., 337, is relied upon by claimant. As stated in the opinion in that case by Mr. Justice McKenna, “ The only question in the case is the construction of paragraph 296,” and after quoting that paragraph the opinion says: “ It is the contention of the Government that the paragraph separates still wines in bottles into three classes and fixes a specific duty in each as follows ” (setting them out a, 5, e). *508 Then follows this expression of opinion: “ We think the contention is light and needs no comment to make it clear.” It seems evident, therefore, that the court (or a majority of the court) did not regard said paragraph 296 as ambiguous or doubtful in meaning, and, on the contrary, considered that no comment was necessary to make it clear. But the Government also contended that the Treasury decisions for a long period had given a like interpretation to said paragraph 296, and the opinion proceeds: “ We have said that when the meaning of a statute is doubtful great weight should be given to the construction placed upon it by the department charged with its execution, Robertson v. Downing., 127 U. S., 607; United States v. Healy, 160 U. S., 136,” thus recognizing the principle annottnced in said two cases and many others that the meaning of the act must be “ doubtful ” before a court is warranted in accepting a departmental construction of it which is variant from the meaning the court would otherwise give the act.
The question involved was, it seems to us, decided by a majority of the court without reference or appeal to the department’s exposition, while the entire court agreed that if the statute was of doubtful interpretation the contemporaneous exposition of the executive department charged with its execution and continued through a long period was entitled to “ great weight,” but that, as stated in one of the cases there cited, “the regulation of a department of the Government is not, of course, to control the construction of an act of Congress when its meaning is clear.” Robertson v. Downing, 127 U. S., 613.
A third statement in the opinion is: “And we have decided that the reenactment by Congress without change of a statute which had previously received long-continued executive construction is an adoption by Congress of such construction. United States v. Falk, 204 U. S., 143, 152.” It is to be noted that two of the justices who concurred placed their concurrence upon the second of the three propositions stated in the opinion.
In the Falk case, supra, cited to the third proposition in the above-mentioned case, the question involved construction of a proviso in the tariff act of 1897, where it appeared that *509 the opinion of the Attorney General had been sought by the Treasury Department as to the effect of a proviso in section 50 of the tariff act of 1890. He gave his opinion, holding that the said proviso was of general application and was not to be restricted to the matter of said section immediately preceding the proviso. 20 Op. Atty. Gen., 80. This construction was followed by the executive officers of the Government until the Dingley Act was passed in July, 1897. The proviso in section 50 of the act of 1890, which had been construed by the Attorney General and acted upon as above stated, was reenacted in section 83 of the Dingley Act, and the question was pressed that a “ proviso ” should be referred “ only to the provision of a statute to which it is appended.” The court, speaking through Mr. Justice Mc-Kenna, said: “■ This, then, is our view: The Attorney General having construed the proviso of section 50 of the act of 1890 as not restricted to the matter which immediately preceded it, but as of general application, and this construction having been followed by the executive officers charged with the administration of the law, Congress adopted the construction by the enactment of section 83 of the act of 1897, and intended to make no other change than to require as the basis of duty the weight of the merchandise at the time of entry instead of its weight at the time of its withdrawal from warehouse.”
But we find that after the decision of the last-named case the Supreme Court, in Copper Queen Mining Co. v. Arizona Board, 206 U. S., 474, 479, speaking through Mr. Justice Holmes, says:
“And again, when for a considerable time a statute notoriously has received a construction in practice from those whose duty it is to carry it out and afterwards is reenacted in the same words, it may be presumed that the construction is satisfactory to the legislature, unless plainly erroneous, since otherwise naturally the words would have been changed,” citing New York, N. H. & H. Railroad Co. v. Interstate Commerce Commission, 200 U. S., 361, wherein Mr. Justice White, delivering the opinion, refers to rulings made by the commission in certain cases adhered to during many years and concedes (p. 401) “ that the interpretation given by the com *510 mission in those cases to the act to regulate commerce is now binding and as restricted to the 'precise conditions which were passed on in the cases referred to must be applied to all strictly identical cases in the future, at least until Congress has legislated on the subject. We make this concession, because we think we are constrained to do so in consequence of the familiar rule that a construction made by the body charged with the enforcement of a statute, which construction has long obtained in practical execution and has been impliedly sanctioned by the reenactment of the statute without alteration in the particulars construed when not plainly erroneous, must be treated as read into the statute.” (Italics ours.)
The language of the opinion in the Hermanos case, 209 U. S., 339, is quoted in The Komada case, 215 U. S., 396, which involved construction of a clause in the tariff act, just as the Falk and Hermanos cases involved tariff laws, and the long-continued construction of the Treasury Department was upheld, the ruling having been followed in the department from 1894 and “receiving in the meantime at least a qualified approval by Congress” (p. 397).
In Latimer v. United States, 223 U. S., 501, effect was given to certain words in the tariff act of 1897 which had been given by the construction by the Supreme Court of the same words in the act of 1883, “ on the theory that in using the phrase in the later statute Congress adopted the construction already given it by this court” (p. 504), citing Baruch’s case, 223 U. S., 191.
The general rule stated by text writers in that the reenactment of a statute which has received a judicial construction amounts to a legislative adoption of such construction. Endl. on International Stat., secs. 368, 371; Black Inter. Laws, 161; 36 Cyc., 1153.
Where certain words in a statute have received a construction by the Supreme Court, Congress is presumed to have knowledge of it, and “like words being again repeated by Congress it may well be considered that a like construction was intended and was expected to be given to those words.” Mason v. Fearson, 9 How., 248, 258; Logan v. United States, 144 U. S., 263, 301; The Abbottsford, 98 U. S., 440-444; *511 Kepner v. United States, 195 U. S., 100, 124; Talbert case, 25 C. Cls., 158.
“It is doubtless a rule that when a judicial construction has been given to a statute the reenactment of the statute is generally held to be in effect a legislative adoption of that construction. This, however, can only be when the statute is capable of the construction given to it and when that construction has become a settled rule of conduct. The rule, we think, is inapplicable to this case. In the first place, the decisions of the Internal Revenue Commissioner can hardly be denominated -judicial constructions.” (Italics ours.) Dollar Savings Bank v. United States, 19 Wall., 227-237; Fairbanlc case, 25 C. Cls., 158.
It was said by Sanborn, circuit judge, in Hemmer v. United States, 204 Fed., 898, 905: “And it is the function and duty of the officers of the judicial department of a government, which they may not lawfully renounce, to exercise their own independent judgments, guided only by the established legal principles and the recognized canons of interpretation, in the construction of its statutes, and to adjudge their just and true interpretation, even though the officers of an executive department have construed them otherwise,” citing authorities.
Whether, therefore, we are to be governed by the rule as stated in the Falk case or as stated in the Hermanos case, where emphasis is laid upon the fact that the Attorney General had given an opinion which had been followed, though that opinion admits its construction leads to a departure from a preexisting rule of action by the department, 20 Op. Atty. Gen., 82, or whether we are to be governed by the more limited rule announced in the other cases cited above, and especially whether the construction which is supposed to be adopted by a reenactment of a statute refers to a judicial, or authoritative, construction given the earlier act, is in view of the positive language of the Falk case not entirely free from doubt.
It may be said, however, that as we read the Falk case the said statement of the rule was not essential to the decision made. And if the view we have expressed, which finds sup *512 port in many decisions, that executive exposition is given little consideration where the meaning of a statute is clear, Osborne v. Blank, 9 Wheat., 738, and that it is only where the statute is ambiguous or doubtful that resort may be had to contemporaneous executive construction, Houghton v. Payne, 194 U. S., 88, and other cases sufra, it does not seem that the reenactment of a statute which in the particular involved had been construed by the executive department would in any event carry into the new statute that construction unless the older statute were itself ambiguous and doubtful. For it must be conceded that the proper construction of a statute is a judicial function, and if its meaning is clear there is no necessity for construction. Thornby v. United States, 113 U. S., 310.
But the contention of claimant upon the effect of a reenactment assumes that the act of 1873 was reenacted in 1905, at least to the extent of adopting the practice or construction of the department under the former act. This contention is, however, open to serious doubt. The act of 1873 was not reenacted in 1905, but in the Post Office appropriation bill for that year appears a proviso as follows:
“Provided, That hereafter before making the readjustment of pay for transportation of mails on railroad routes the average weight shall be ascertained by the actual weighing of the mails for such a number of successive working days, not less than ninety, at such times after June thirtieth, nineteen hundred and five, and not less frequently than once in every four years, and the result to be stated and verified in such form and manner as the Postmaster General may direct.” 33 Stat. L., 1088.
It is evident that Congress was not satisfied with the average weights being obtained, whether the dissatisfaction arose from the method or the result, and they therefore changed the law to insure a more satisfactory average, and when we find an amendment which is designed to change a feature in or practice under the older act we think the amendment should be construed to give it the effect intended.
We may eliminate from consideration any question of equities growing out of contracts made in accordance with *513 the construction which, prior to 1907, the Post Office Department had applied to the act of 1873 and its amendatory acts. Such a question was involved in one branch of the case of United States v. Alabama Great Southern Railroad Co., 142 U. S., 615. In the present case is involved the right to make a new contract and not a change in any respect of a preexisting one. The question therefore is whether the Postmaster General was authorized in ascertaining the average weight per day to adopt the statutory rule or was he bound by prior executive exposition and long-continued practice? In other words, to state it plainly, must he obey the statute or the department’s exposition of it?
In the construction of an act the court’s aim must be to arrive at the intention of the legislative body and to apply the language of the act toward the attaining of that intention, if possible. As words must be used as the vehicle of the legislative intention, their popular or received import furnishes the general rule for the interpretation of the laws in which they appear, and whilst a strict literalism is not required, especially if it tends to defeat the purposes of the law, yet where the language used is clear and imperative “ reasoning ah inconvenienti is of no avail and there is no room for construction.” Maillard v. Lawrence, 16 How., 261; Boudinot v. The United States, 11 Wall., 616. While it is the duty of courts to ascertain the meaning of the legislature from the words used in the statute and the subject matter to which it relates there may be an equal duty to restrict the meaning of general words whenever it is found necessary to do so in order to carry out the legislative intent. United States v. Freight Assn., 166 U. S., 290, 320. AnH where words or terms used are ambiguous or are found to have application to diverse conditions actually arising their meaning must be resolved by “ an examination of and comparison of the doubtful words with the context of the law, considering its reason and spirit and the inducing cause of its enactment.” Endl. Inter Stat., secs. 26, 27. But the ambiguity or doubt must inhere in the language of the act as applicable to conditions to which the law is intended to apply. It is not the doubt occasioned by a con *514 sideration of whether an executive exposition put into practice is free from criticism which will produce the ambiguity or doubt in the meaning of the terms of the statute itself, because misconstruction is not sufficient to generate the doubt required or produce a latent ambiguity. In City of New York v. New York City Railway Co., 193 N. Y., 543, the rule of practical construction as stated above, Chicago v. Sheldon, 9 Wall., 50, 54; United States v. Alabama Great Southern Railway Co., 142 U. S., 615, is recognized to the broad extent that the practical construction of a doubtful statute by the legislative and executive departments continued for many years is held to have controlling weight in its interpretation and to have great weight even in the construction of the Constitution itself. Illustrating by two classes of cases then before it, the court expressed the controlling distinction between them to be that in the one there was ambiguity in the grant and in the other there was not, saying that the doctrine of practical construction should not be applied where there is no ambiguity in the grant and adding (p. 550): “ We think that position is sound, for the doctrine is never applied unless the door is opened by an ambiguity, which is the foundation of the principle upon which the doctrine is founded. It goes without saying that the ambiguity must not be captious, but should be so serious as to raise a reasonable doubt in a fair mind reflecting honestly upon the subject, before the principle of practical construction can be applied.”
Is the act of 1873, as amended, ambiguous in any particular, especially with reference to the matters involved in this action? Is there any ambiguity in the amendment of 1905 above quoted?
Claimant insists that (1) both questions must be answered affirmatively, and (2) if not, that the amendment of 1905 was an adoption of a long-continued executive exposition of the clause which it amends. As to the last proposition, we dismiss it from further consideration upon our understanding of the authorities to the effect that if the act is not, when properly considered, ambiguous, and uncertain, contemporaneous, and long-continued executive exposition and practice should not prevent the court construing the act *515 according to its terms and the intention of Congress, and that said amendment, in view of its purpose, was not an adoption by Congress of the departmental construction or practice under the prior act. It is earnestly urged that the Postmaster General in 1884 called upon the Attorney General for an opinion upon the departmental construction of the act of 1873, and received an opinion from an Acting Attorney General, 18 Op. Atty. Gen., 71, that the construction was correct, “ and that a departure from it would defeat the intention of the law and cause no little embarrassment.”
As above suggested, an opinion by the Attorney General may be sought, and he acts upon an authoritative statement of facts furnished by the head of the department asking for the opinion. 18 Op. Atty. Gen., 487.
The Postmaster General’s letter to the Attorney General states that it had been “ the practice since 1875 in arriving at the average weight of mails per day on these two classes of service [6-day and 7-day roads] to treat ‘ successive working days’ as being composed of the 6 working or secular days in the week,” and then follows, by way of illustration, the practice as applied to two different routes, each supposedly carrying the same amount of mail per day. In the one the mails are weighed for 30 successive working days, the total divided by 30, and the average weight per day thus found. In the other the mails are weighed for 30 successive working days “ and for the intervening Sundays (£ the weight on Sunday being treated as if carried on Mondays ’), the weighing as before covering usually a period of 35 days.” The total of 35 days’ weighings is divided by 30 and “ an average weight of mails per day” thus attained. It appears that the “successive working days” in the law were construed as exclusive of Sundays, and the Sundays’ mails were treated for the purpose of the computation “ as if carried on Mondays.” There can be no question that “ an average” of 35 weighings can not be secured by dividing the total by 30. A quotient may be gotten by that method just as one would be gotten if 19 were used as the divisor, but that quotient does not represent the daily average weight. Nor can the method be sustained, within the lan *516 guage of tbe act, unless there was a discretionary power vested in the Postmaster General by it as regards ascertaining the average daily weight of mails transported. We are not informed whether the treating of the Sunday weighings “ as if carried on Mondays ” was thought to find support in the act of March 3,1875 (18 Stat. L., 341), which changed the practice of weighing the mails from the railroad companies to the department, directing the Postmaster General “to have the mails weighed as often as now provided by law by the employees of the Post Offiee Department, and have the weights stated and verified to him by said employees vrnder such instructions as he may consider just to the Post Office Department and the railroad companies,” though the practice referred to in the said letter of the Postmaster General seems to have existed “since 1875.” It is conceivable that in the language of the act of 1875, above italicized, there may have been considered some warrant for having the weights of Sundays’ mails treated as carried on Mondays, and so stated and verified under instructions from the Postmaster General, he considering that method just to the Post Office Department and the railroads. But if a discretion were thus lodged, it is manifest that the discretion did not wear out in its use and that it could be exercised again and differently in 1907. The Postmaster General’s letter recognized the meaning of successive working days and the apparent necessity of treating all mails in ascertaining their weights as .carried on working days, thus appreciating at, least the importance and meaning of the words of the statute. It must be admitted that the Acting Attorney General, 18 Op. Atty. Gen., 71, stated that the construction placed by the Postmaster General upon said act for ascertaining .the average weight of mail “ is correct,” but it is also apparent that the Postmaster General’s letter stated there were two methods used in practice, one applicable to six-day and the other to seven-day routes, and another Attorney General, more than 20 years thereafter, said a like construction was “ an impossible one.” 26 Op. Atty. Gen., 390. While great respect is due to opinions of the Attorneys General, and an apparently controlling influence was ascribed to that mentioned in the Hermanos *517 case, they are- not necessarily controlling. And “ without stopping to review the subjects in detail we content ourselves with saying that we think neither the reference to expressions in debate, upon the concession for the sake of argument that they are competent to be looked at, nor an opinion of the Attorney General upon which reliance is placed are adequate to control or modify the conclusion we have reached as to the meaning of the provision.” Per Mr. Chief Justice White delivering the opinion in Lewis Publishing Co. v. Morgan, 29 U. S., 228, 311.
The argument for claimant is that the amendment of 1905, taken in connection with the whole act, is ambiguous and doubtful, one of the reasons for the contention being that its literal application works a hardship or is inequitable toward the roads carrying mails every day in the year, while favoring the roads carrying them only six days per week. We do not concur in that view, and at the cost of some repetition we point out that the Government having the right to declare the terms upon which it would contract for transportation of the mails could and did provide a plan whereby an average daily weight of the mails carried could be ascertained. The weight of the mails had always been a controlling element in fixing the price of transportation, and three methods were open for consideration: (1) Actual weights to be secured by weighing the mails day in and day out, a method expensive, inconvenient, uncertain in making appropriations, and therefore impracticable; (2) estimating the weights from such data as was attainable, a method unreliable, unsatisfactory, and open to more serious objections; (3) average weights to be ascertained by .a definite rule which admitted of a sufficient number of weighings to enable the Government and the railroads alike to deal on terms of exact equality and approximate at least the actual weights. And this plan lends certainty to the element of weight, furnishing as it does a basis for estimates for appropriations. The theory of the law was that compensation should be based upon the average weight of mails carried daily per mile per annum, readily ascertainable when the average weight carried daily upon the whole length of the route was known.
*518 The three essential elements of the contract would be weight, mileage, and price in connection with due frequency and speed. The mileage was known, the price could be fixed, but what of the weight?
The rule was established for finding the average weight, the statute authorized contracts based upon such average weight, and the period of the contracts could be four years. The amelioration of the supposed hardships or inequity as between roads carrying mails different numbers of days was not to be accomplished by a different and incorrect “ average,” but was amply provided for within the maximum price. The Postmaster General could exercise some discretion in the compensation offered, but the average weight should be found by the statutory rule, without which there was no authority conferred by the statute to ascertain or contract with reference to average weights. Claimants’ contention therefore lays emphasis on the effect of the average weights as between classes of roads instead of taking note of the fact that one of the conditions prescribed by the act is that the price was to be regulated according to the “ frequency and speed” and the facilities furnished to properly handle and distribute the mails. It affords no reason apparent to us for the adoption of a method which increases by one-sixth the proper daily average in favor of one class of roads and extends the increase throughout 365 days per year for four years. The question when the average weight per day was fixed became one of contract between the Government and the roads. Atchison, Topeka & Santa Fe Ry. Co. v. United States, 225 U. S., 640; Texas Pacific By. Co. v. United States, 28 C. Cls., 379, 310.
There is no reasonable ground for mistaking the meaning of the amendment of 1905. It declares that “ hereafter ” the average weight shall be ascertained by a rule stated and of ready application. The words “ average weight,” which are to be ascertained “in every case” by a definite rule, are easily understood. We can not conceive of its being used in said connection by Congress in any involved sense. We must construe it in its ordinarily accepted sense.
“It is not only the safer course to adhere to the words of the statute construed in their ordinary import, instead *519 of entering into any inquiry as to the supposed intention of Congress, but it is the imperative duty of the court to do so.” Bate Refrigerator Co. v. Sulzberger, 157 U. S., 1, 33.
It is a matter of common knowledge that the teachers in the public schools in their reports of the pupil’s record state the marks of the different studies and the average of all. What would be thought of a teacher finding the average of sis studies by dividing by 6 and then finding the average of seven studies by dividing by 6, upon the theory that in the latter case the student was doing more work?
In Maillard v. Lawrence, 16 How., 251, 261, it is said:
“And it would seem to be a most extravagant supposition which could hold that, in the enactment of a law affecting the interests of the Nation at large, the legislature should select for that purpose language by which the Nation or the mass of the people must necessarily be misled. The popular or received import of words furnishes the general rule for the interpretation of public laws as well as of private and social transactions, and wherever the legislature adopts such language in order to define and promulge their action or their will, the just conclusion from such a course must be that they not only themselves comprehended the meaning of the language they have selected, but have chosen it with reference to the known apprehension of those to whom the legislative language is addressed and for whom it is designed to constitute a rule of conduct, namely, the community at large.”
Our conclusion is that said statute as amended in the particulars involved in this case does not authorize the application of the rule of contemporaneous and long-continued executive exposition, but that it can be and should be given the construction which its words in their usual and generally accepted meaning import, and that the amendment of 1905 was not an adoption of any preexisting departmental practice which is controlling upon the interpretation to be given by the court.
The Postmaster General issued Order No. 165, dated March 2, 1907, reading:
“ That when the weight of mail is taken on railroad routes, the whole number of days the mails are weighed shall be used as a divisor for obtaining the average weight per day.”
*520 And later issued Order No. 412, dated June 7, 1907, reading:
“ Ordered,, That Order 165, dated March 2, 1907, be, and the same is hereby, amended to read as follows:
“ That when the weight of mail is taken on railroad routes the whole number of days included in the weighing period shall be used as a divisor for obtaining the average weight per day.”
For the purpose of obtaining the daily average of mail transported the country had been divided into four divisions, called first (the Eastern States), second (Southern States), third (Middle States), fourth (Western States), the four-year periods commencing on Julyl of different years; and in the division covering claimant’s territory the four-year period commenced July 1, 1907.
It appears that on or about February 12, 1907, the Postmaster General notified claimant of the direction given to weigh the mails on said routes and transmitted to it “ a distance circular” calling for certain information, such distance circular containing a form of the acceptance of the proposed contract to be signed by the railroad company. Under date of July 1,1907, the claimant wrote a letter to the Post Office Department calling attention to certain features in the distance circular and making “protest” to certain features mentioned. In the meantime claimant had received notice of said Order No. 412. Claimant continued to transport the mails from July 1, 1907, the beginning of the new four-year period, and, on September 16, 1907, returned the distance circular duly signed, except that to the form of acceptance there were added before the signature the words, “Exception taken to Order No. 165, issued by the Postmaster General March 2,1907, and Order No. 412, issued by the Postmaster General June 7, 1907 (see attached letter of protest, bearing date of July 1, 1907).”
To this the Second Assistant Postmaster General replied on October 3, 1907, stating in effect that it must be understood that the claimant, in the performance of the service from the beginning of the contract term and during the continuance of the service, would be subject to all the postal *521 laws and regulations. Payments have been regularly made to claimant based upon the terms of said Order No. 412.
Conceding for the sake of argument that the claimant could have objected to Order 412, we think the objection should have been timely and that some effect should be given to its action in entering upon the performance of the contract for carrying the mails without objection made before July 1, 1907, when the contract period commenced, if indeed the letter of July 1,1907, can be construed to be an objection. By holding the distance circular until September and then returning it with “ exception ” noted claimant waived any right of objection, not only upon the principle statéd in Philadelphia & Baltimore R. R. Co. v. United States, 103 U. S., 703, and Texas & Pacific R. R. Co. case, 28 C. Cls., 379, wherein it is said, “The contract could not be changed-by complaints and protests,” but also upon another principle, namely, that where an offer is made by one party its acceptance by the other may as well be signified by doing acts which clearly show assent as by express words, especially when there is a duty on the part of such party to make known his unwillingness to proceed under the contract. “ If such acts are done with the knowledge of the party making the offer, they amount to an acceptance thereof.” I Page Contr.., sec. 50. And illustrations of the rule may be found in Muscatine Water Co. v. Lumber Co., 85 Iowa, 112; 39 Am. St. R., 287; Horner School v. Westcott, 32 S. E. R., 885; Old Jordon Co. v. Society, 164 U. S., 261; Vogel v. Pekoc, 157 Ill., 339; 30 L. R. A., 493, where it is said: “ The acceptance of the contract by the parties of the first part and holding it and acting upon it as a valid instrument may be regarded as equivalent to its formal execution on their part.” Thompson v. Sanborn, 52 Mich., 141.
Where matters of such grave importance as the proper transportation of the mails are involved it is of prime importance that the terms and regulations as between the carrier and the Government should be known, and the claimant having the right to refuse the terms offered should be held to the effect of its action in proceeding with the performance and receiving payments based upon the department’s *522 understanding of the contract. Texas & Pacific Ry. Co. v. United States, 28 C. Cls., 379; Eastern R. R. Co. v. United States, 129 U. S., 391, 396; Atchison, Topeka & Santa Fe R. R. Co. v. United States, 225 U. S., 640.
An order will be entered dismissing the petition.

 The act of March 3, 1873, appropriates for the service of the Post Office Department “ out of any moneys in the Treasury arising from the revenues of said department, in conformity to the act of July second, eighteen hundred and thirty-six” (5 Stats., 80), “Por inland mail transportation, fourteen million eight hundred and forty thousand and twenty dollars,” and makes appropriations for messengers, route agents, mail-route messengers, local agents, letter carriers, etc., and then follows:
“ For increase of compensation for the transportation of mails on railroad routes upon the condition and at the rates hereinafter mentioned, five hundred thousand dollars, or so much thereof as may be necessary: Provided, That the Postmaster General be, and he is hereby, authorized and directed to readjust the compensation hereafter to be paid for the transportation of mails on railroad routes upon the conditions and at the rates hereinafter mentioned, to wit, that the mails shall be conveyed with due frequency and speed; that sufficient and suitable room, fixtures, and furniture, in a ear or apartment properly iighted and warmed, shall be provided for route agents to accompany and distribute the mails; and that the pay per mile per annum shall not exceed the following rates, namely: On routes carrying their whole length an average weight of mails per day of two hundred pounds, fifty dollars; five hundred pounds, seventy-five dollars; one thousand pounds, one hundred dollars; one thousand five hundred pounds, one hundred and twenty-five dollars; two thousand pounds, one hundred and fifty dollars; three thousand five hundred pounds, one hundred and seventy-five dollars; five thousand pounds, two hundred dollars, and twenty-five dollars additional for every additional two thousand pounds, the average weight to be ascertained in every case by the actual weighing of the mails for such a number of successive working days, not less than thirty, at such times, after June thirtieth, eighteen hundred and seventy-three, and not less frequently than once in every four years, and the result to be stated and verified in such form and manner as the Postmaster General may direct: Provided also, That in case any railroad company now furnishing railway post-office cars shall refuse to provide such cars, such company shall not be entitled to any increase of compensation under any provision of this act: Provided further, That additional pay may be allowed for every line comprising a daily trip each way of railway post-office cars, at a rate not exceeding twenty-five dollars per mile per annum for cars forty feet in length; and thirty dollars per mile per annum for forty-five feet cars; and forty dollars per mile per annum for fifty feet ears; and fifty dollars per mile per annum for fifty-five feet to sixty feet cars: And provided also, That the length of the cars required for such post-office railway-car service shall be determined by the Post Office Department, and all such cars shall be properly fitted up, furnished, warmed, and lighted for the accommodation of clerks to accompany and distribute the mails : And provided further, That so much of section two hundred and sixty-five of the act approved June eighth, eighteen hundred and seventy-two, entitled ‘ An act to revise, consolidate, and amend the statutes relating to the Post Office Department,’ as provides that ‘ the Postmaster General may allow any railroad company with whom he may contract for the carrying of the united States mail, and who furnish railway post-office cars for the transportation of the mail, such additional compensation beyond that now' allowed by law as he may think fit, not exceeding, however, fifty per centum of the said rates,’ be, and the same is hereby repealed.”
The act of March 3, 1875 (18 Stat. L., 341), appropriates $17,548,000 for inland mail transportation.
“ And out of the appropriation for inland mail transportation the Postmaster General is authorized hereafter to pay the expenses of taking the weights of mails on railroad routes, as provided by the act entitled ‘An act making appropriations for the service of the Post Office Department for the year ending June thirtieth, eighteen hundred and seventy-four,’ approved March third, eighteen hundred and seventy-three; and he is hereby directed to have the mails weighed as often as now provided by law T>y the employees of the Post Office Department, and have the weights stated and verified to him by said *491 employees under such instructions as he may consider just to the Post Office Department and the railroad companies.”
The act of July 12, 1876 (19 Stats., 79), appropriates for inland mail transportation, separating other than railroad routes from the latter, and—
“ For transportation by railroad one million one hundred thousand dollars: Provided, That the Postmaster General be, and he is hereby, authorized and directed to readjust the compensation to be paid from and after the first day of July, eighteen hundred and seventy-six, for transportation of mails on railroad routes by reducing the compensation to all railroad companies for the transportation of mails ten per centum per annum from the rates fixed and allowed by the first section of an act entitled ‘An act making appropriations for the service of the Post Office Department for the fiscal year ending June thirtieth, eighteen hundred and seventy-four, and for other purposes,’ approved March third, eighteen hundred and seventy-three, for the transportation of mails on the basis of the average weight. And the President of the united States is hereby authorized to appoint a commission of three skilled and competent persons, who shall examine into the subject of transportation of the mails by railroad companies, and report to Congress at the commencement of its next session such rules and regulations for such transportation and rates of compensation therefor-as shall in their opinion be just and expedient, and enable the department to fulfill the required and necessary service for the public. And to defray the expense of said commission the sum of ten thousand dollars is hereby appropriated out of any money in the Treasury not otherwise appropriated.”
By the act approved March 3, 1877 (19 Stats., 386), this commission was continued, but so far as the record in this case shows no report by that commission was made.
The act of June 17, 1878 (20 Stats., 142), appropriates—
“ For transportation by railroad, nine million one hundred thousand dollars ; * * * And provided further, That the Postmaster General be, and he is hereby, authorized and directed to readjust the compensation to be paid from and after the first day of July, eighteen hundred and seventy-eight, for transportation of mails on railroad routes by reducing the compensation to all railroad companies for the transportation of mails five per centum per annum from the rates for the transportation of mails, on the basis of the average weight fixed and allowed by the first section of an act entitled ‘ An act making appropriations for the service of the Post Office Department for the fiscal year ending June thirtieth, eighteen hundred and seventy-seven, and for other purposes,7 approved July twelfth, eighteen hundred and seventy-six.”
The act of March 3, 1905 (33 Stats., 1088), appropriates for inland transportation by railroad routes $40,900,000, of which $120,000 may be employed for other purposes mentioned—
"Provided, That hereafter before making the readjustment of pay for transportation of mails on railroad routes, the average weight shall be ascertained by the actual weighing of the mails for such a number of successive working days not less than ninety, at such times after June thirtieth, nineteen hundred and five, and not less frequently than once in every four years, and the result to be stated and verified in such form and manner as the Postmaster General may direct.”
The act of March 2, 1907 (34 Stats., 1212), appropriates—
“ For inland transportation by railroad routes, forty-four million six hundred and sixty thousand dollars.
“ The Postmaster General is hereby authorized and directed to readjust the compensation to be paid from and after the first day of July, nineteen hundred and seven, for the transportation of mail on railroad routes carrying their whole length an average weight of mails per day of upward of five thousand pounds by making the following changes in the present rates per mile per *492 annum for the transportation of mail on such routes, and hereafter the rates on such routes shall be as follows: On routes carrying their whole length an average weight of mail per day of more than five thousand pounds and less than forty-eight thousand pounds the rate shall be five per centum less than the present rates on all weight carried in excess of five thousand pounds; and on routes carrying their whole length mi average weight of mail per day of more than forty-eight thousand pounds the rate shall he five per centum less than the present rate on all weight carried in excess of five thousand pounds up to forty-eight thousand pounds, and for each additional two thousand pounds in excess of forty-eight thousand pounds at the rate of nineteen dollars and twenty-four cents upon all roads other than land-grant roads, and upon all land-grant roads the rate shall be seventeen dollars and ten cents for each two thousand pounds carried in excess of said forty-eight thousand pounds ”